KIMBERLY SWAIN (SBN 100340)
Kim.Swain@disabilityrightsca.org
AARON FISCHER (SBN 247391)
Aaron.Fischer@disabilityrightsca.org
JENNIFER STARK (SBN 267062)
Jennifer.Stark@disabilityrightsca.org
SAMUEL JAIN (SBN 295739)
Samuel.Jain@disabilityrightsca.org
SARAH GREGORY (SBN 303973)
Sarah.Gregory@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
1330 Broadway, Suite 500
Oakland, CA 94612
Tel:  (510) 267-1200
Fax:  (510) 267-1201

IRA A. BURNIM, *Pro Hac Vice**
irabster@gmail.com
JENNIFER MATHIS, *Pro Hac Vice**
jenniferm@bazelon.org
LEWIS BOSSING (SBN 227492)
lewisb@bazelon.org
BAZELON CENTER FOR MENTAL HEALTH LAW
1090 Vermont Avenue. NW, Suite 2020
Washington, DC 20005
Tel:  (202) 467-5730
Fax:  (202) 223-0409

*Pro Hac Vice Applications Forthcoming*

Attorneys for Plaintiff
(Additional counsel on following page)

DISABILITY RIGHTS CALIFORNIA,
1330 BROADWAY. SUITE 500
OAKLAND, CALIFORNIA 94612
(510) 267-1200

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DISABILITY RIGHTS CALIFORNIA, a California nonprofit corporation, | Case No. |
| Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| vs. | |
| COUNTY OF ALAMEDA; ALAMEDA COUNTY BEHAVIORAL HEALTH CARE SERVICES; and ALAMEDA HEALTH SYSTEM, | |
| Defendants. | |

LINDA M. DARDARIAN (SBN 131001)
ldardarian@gbdhlegal.com
ANDREW P. LEE (SBN 245903)
alee@gbdhlegal.com
RAYMOND A. WENDELL (SBN 298333)
rwendell@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
300 Lakeside Drive, Suite 1000
Oakland, CA 94612
Tel:  (510) 763-9800
Fax: (510) 835-1417

CLAUDIA CENTER (SBN 158255)
ccenter@dredf.org
SYDNEY PICKERN (SBN 303908)
spickern@dredf.org
DISABILITY RIGHTS EDUCATION AND DEFENSE FUND
3075 Adeline Street, Suite 210
Berkeley, CA 94703
Tel:  (510) 644-2555
Fax:  (510)841-8645

*Attorneys for Plaintiff*

785552.7

# INTRODUCTION

1.      Plaintiff Disability Rights California ("DRC" or "Plaintiff") brings this action for declaratory and injunctive relief against Alameda County, Alameda County Behavioral Health Care Services ("ACBHCS"), and Alameda Health System ("AHS") (collectively, "Defendants").  DRC challenges Defendants' needless and illegal segregation of adults with serious mental health disabilities into Alameda County's psychiatric institutions.  DRC also challenges Defendants' practice of subjecting adults with serious mental health disabilities to a high risk of such institutionalization, including those experiencing homelessness and those who have been incarcerated in Alameda County's jail.  Defendants must increase access to community-based mental health services to end this unlawful and extremely damaging disability discrimination.

2.      Defendants' failure to provide intensive community-based services puts adults with serious mental health disabilities, especially Black adults with such disabilities, at constant and high risk of unnecessary institutionalization.  Alameda County's psychiatric detention rate for people with mental health disabilities is ***more than three-and-a-half times the California statewide average***.  Defendants have detained more than 10,000 people in the County's psychiatric institutions since January 2018.  During this time, Defendants have also detained hundreds of people more than ten times, the majority of whom are Black.  Some people have been institutionalized more than 100 times.  These "cycling admissions" are "the hallmark of a failed system." *United States v. Mississippi*, 400 F. Supp. 3d 546, 555 (S.D. Miss. 2019).

3.      DRC is California's Protection and Advocacy ("P&A") system.  It is empowered and charged by federal law to protect the rights of California residents with mental health disabilities.  In 2018, DRC opened an investigation into Alameda County's practices regarding unnecessary segregation in the County's psychiatric institutions.  These institutions include John George Psychiatric Hospital ("John George"), a public psychiatric hospital operated by Alameda Health System, and Villa Fairmont Mental Health Rehabilitation Center ("Villa Fairmont"), a locked psychiatric institution located on the same campus as John George.  On November 1, 2019, DRC issued a written probable cause finding detailing the results of DRC's

1

investigation, attached herein as **Appendix A**.  Specifically, DRC found probable cause to believe that the mental health system's actions constitute abuse and/or neglect based on, *inter alia*, Defendants' failure to provide people with serious mental health disabilities with needed services in the most integrated setting appropriate.  Because Defendants have failed to remedy the issues identified in DRC's probable cause finding, DRC is compelled to now file suit.

4.      DRC brings this action on behalf of adult Alameda County residents who have serious mental health disabilities and who are unnecessarily segregated into the County's psychiatric institutions or are at serious risk of being needlessly segregated into these institutions. For the purpose of this action, DRC refers to these individuals—who are primary beneficiaries of DRC's activities and advocacy—as "DRC Constituents."

5.      Defendants Alameda County and ACBHCS subject DRC Constituents to unnecessary institutionalization and a serious risk of unnecessary institutionalization by failing to provide timely access to intensive community-based services, which are necessary to prevent DRC Constituents from requiring emergency psychiatric institutionalization or inpatient care. These needed services include Full Service Partnerships, assertive community treatment, rehabilitative mental health services, intensive case management, crisis services, substance use disorder treatment, peer support services, supported employment, and supported housing. Defendants Alameda County and ACBHCS operate existing services in a manner and amount that is insufficient to meet DRC Constituents' needs, including systemic failures in the linkages to and the delivery of services.

6.      Defendant AHS, which owns and operates John George, subjects DRC Constituents to unnecessary institutionalization and a serious risk of unnecessary institutionalization by holding people in institutions longer than clinically appropriate, by failing to develop individualized treatment and discharge plans for DRC Constituents detained at John George, and by failing to ensure timely and effective implementation and coordination with the County, ACBHCS, and community-based service providers.

7.      If Defendants Alameda County, ACBHCS, and AHS collectively provided needed, intensive, and culturally-responsive community services, Defendants would divert DRC

Constituents from psychiatric institutions such as John George and Villa Fairmont when appropriate, patient stays in psychiatric institutions would be shorter, and DRC Constituents could live stably in their own homes and communities with fewer psychiatric crises and better outcomes.

8.      Defendants' current policies and practices have dire effects on DRC Constituents.  Defendants' unnecessary institutionalization of DRC Constituents in psychiatric facilities restricts their freedom to participate in life activities—such as family events, educational opportunities, and stable employment—and perpetuates harmful stereotypes that individuals with serious mental health disabilities are incapable or unworthy of community participation.

9.      Defendants' failure to provide adequate intensive community-based mental health services causes many DRC Constituents to face homelessness and/or incarceration in the County's Santa Rita Jail ("jail") for behaviors related to their mental health disabilities. Approximately 50% of the people committed to psychiatric institutions in Alameda County while homeless have also been incarcerated in the County's jail.  A grossly disproportionate number of those experiencing psychiatric institutionalization, incarceration, and homelessness are Black.

10.      Defendants' failures, which result in needless institutionalization, also place DRC Constituents at heightened risk of contracting COVID-19.  Within the last two weeks, COVID-19 has started spreading through Santa Rita Jail, and the risk of mass spread through psychiatric facilities and homeless shelters in Alameda County is extreme.  Defendants must address the grave risk that COVID-19 poses to DRC Constituents by serving them in the community with adequate community-based mental health services.

11.      Unnecessary institutionalization causes irreparable harm.  One DRC Constituent, Azizah Ahmad, was detained at John George multiple times over the course of one summer.  Ms. Ahmad describes each experience with psychiatric institutionalization as leaving her "with more trauma than she came in with."  Her story and others are described herein.

12.      Defendants' actions violate Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131-12134, Section 504 of the Rehabilitation Act of 1973

("Section 504" or the "Rehabilitation Act"), 29 U.S.C. §§ 794 *et seq.*, and California Government Code sections 11135-11139 ("Section 11135").  The ADA and Rehabilitation Act forbid all forms of discrimination against persons with disabilities, including needless unwarranted institutionalization.  *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999).  California law provides similar protections.

13.     Defendants' unnecessary institutionalization of DRC Constituents and their failure to provide needed intensive community-based services have irreparably harmed DRC Constituents, and will continue to harm them irreparably unless this Court intervenes.  In order to prevent DRC Constituents' unnecessary institutionalization, Plaintiff seeks an order from this Court directing Defendants to provide needed intensive community services to DRC Constituents, and effective linkages to ensure meaningful access to such services.

## JURISDICTION

14.     This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201, and 28 U.S.C. § 2202.  A substantial, actual, and continuing controversy exists between the parties.  The Court's exercise of supplemental jurisdiction over Plaintiff's claims under state law is proper, as the state law claims "are so related to [Plaintiff's claims] that they form part of the same case or controversy."  28 U.S.C. § 1367(a).

## VENUE & INTRADISTRICT ASSIGNMENT

15.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. §§ 1391(b)(1) and (2).

16.     Defendants reside or are organized in the Northern District of California and the events or omissions giving rise to this action arose in Alameda County, which is located within the Northern District of California.  Plaintiff Disability Rights California also has offices in Alameda County, and its constituents reside in Alameda County.

17.     While this action arises in Alameda County and would ordinarily be assigned to the San Francisco or Oakland Division of the Northern District of California pursuant to Civil Local Rule 3-2(c) and (d), this action concerns substantially the same parties as *Babu v. Cnty. of Alameda*, Case No. 18-07677 (N.D. Cal.), which was filed on December 21, 2018, and is pending

4

785552.7

before the Honorable Nathanael Cousins of the San Jose division of this Court.  In order to avoid an unduly burdensome duplication of labor and expense or conflicting results if the cases are conducted before different Judges, this action should be related to *Babu* and assigned to Magistrate Judge Cousins pursuant to Civil Local Rule 3-12.

## PARTIES

### Plaintiff DRC and its Constituents

18.     Plaintiff Disability Rights California is a federally funded nonprofit corporation organized under the laws of the State of California, with offices in Oakland, Sacramento, Los Angeles, Fresno, Ontario, and San Diego.  DRC's mission is to advocate, educate, investigate, and litigate to advance the rights and dignity of all people with disabilities.

19.     The State of California has designated DRC to serve as California's Protection and Advocacy ("P&A") system for individuals with disabilities, pursuant to the Developmental Disabilities Assistance and Bill of Rights ("DD") Act, 42 U.S.C. §§ 15041 *et seq.*, the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), 42 U.S.C. §§ 10801 *et seq.*, and the Protection and Advocacy of Individual Rights Act, § 29 U.S.C. § 794(e).

20.     PAIMI provides for the establishment and funding of P&A systems, including DRC, to investigate the abuse and neglect of people with mental health disabilities, to engage in protection and advocacy "to ensure that the rights of individuals with mental health disabilities are protected," and "to ensure the enforcement of the Constitution and Federal and State statutes" on behalf of people with mental health disabilities.  42 U.S.C. §§ 10801(b)(1), 10801(b)(2)(A).  As California's P&A system, DRC is authorized to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State."  42 U.S.C. § 10805(a)(1)(B); *see also Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1110 (9th Cir. 2003).

21.     Individuals with serious mental health disabilities have representation in DRC and guide and influence its activities.  DRC is governed by a multi-member board of directors comprised predominantly of people with disabilities and their families.  DRC's board is advised by a PAIMI advisory council, the majority of which, including the advisory council chair, are

785552.7

1   individuals who have received mental health services or have family members who do.  The

2   PAIMI advisory council has significant input in setting DRC's goals and objectives.  Also, DRC

3   uses surveys, focus groups, and public hearings to collect input from people with disabilities and

4   their communities, and uses that input to set its goals and objectives.

5       22.     DRC fulfills its federal mandate under PAIMI by providing an array of

6   protection and advocacy services to people with mental health disabilities across California,

7   including individuals who have been unnecessarily institutionalized or who are at risk of such

8   institutionalization.

9       23.     Under this authority, DRC pursues legal remedies on behalf of people with

10  disabilities in California and, in the context of this action, adult Alameda County residents who

11  are unnecessarily segregated in the County's psychiatric institutions or are at serious risk of being

12  needlessly segregated into these institutions, all of whom are the primary beneficiaries of DRC's

13  activities.  It is on behalf of these individuals that DRC proceeds and collectively refers to as the

14  "DRC Constituents."  *See Hunt v. Washington State Appl. Adver. Comm'n*, 432 U.S. 333, 343

15  (1977); *Mink*, 322 F.3d at 1111-12.

16      24.     The DRC Constituents as defined herein each have a serious mental health

17  disability that substantially limits one or more major life activities.

18      25.     The majority of DRC Constituents defined herein are eligible to receive services

19  under California's Medicaid program (known as "Medi-Cal"), as well as services funded by

20  California's Mental Health Services Act.

21      26.     DRC has a shared interest in the resolution of the issues alleged herein because

22  it has devoted significant organizational resources to investigating Defendants' violations and

23  advocating for necessary remedies.

24      27.     DRC has standing to bring this action to vindicate the rights of the DRC

25  Constituents under the ADA, the Rehabilitation Act, and state law to be free of unnecessary

26  institutionalization and to receive needed intensive mental health services in their homes and

27  communities.  DRC Constituents have representation and influence in DRC's operations.  The

28  participation of individual DRC Constituents in this lawsuit is not required.  The declaratory and

6

785552.7

injunctive relief requested is appropriate for DRC to pursue on behalf of its constituents and is germane to DRC's mission and activities.

28.     The DRC Constituents include the following individuals, each of whom would have standing to bring this lawsuit in his or her own right.  Their experiences illustrate the many ways in which Defendants' practices harm DRC Constituents.

### Azizah Ahmad

29.     Azizah Ahmad is a 41-year-old Black Alameda County resident and mother of three children.  She is currently working for the U.S. Census as a census field supervisor and is enrolled in a tech-related online certificate program.  Ms. Ahmad has been diagnosed with bipolar disorder and is currently enrolled in Medi-Cal.

30.     In 2016, Ms. Ahmad began an intensive community-based day program to treat her bipolar disorder.  She successfully graduated from the program and was symptom-free for three years.  In 2019, however, Ms. Ahmad developed increased symptoms of bipolar disorder due to major stressors in her life.  Ms. Ahmad was admitted to John George Psychiatric Hospital multiple times during the summer of 2019.  She stayed overnight each visit.

31.     Ms. Ahmad recalls her admissions to John George as some of the worst experiences of her life.  Prior to Ms. Ahmad's first visit in June 2019, Ms. Ahmad took steps to manage her symptoms, including by working with her existing mental health providers and scheduling doctor's appointments as needed.  Approximately two days before a doctor's appointment, the County took Ms. Ahmad against her will to John George via an ambulance. The County did not offer Ms. Ahmad any community-based crisis services, and denied her requests to receive inpatient care at Sutter Health, where she had received treatment previously. Defendant AHS employees immediately tied Ms. Ahmad down with leather restraints and forcibly medicated her.  Having decided to hold Ms. Ahmad involuntarily, they provided her a blanket and put her in a large, general population common room.  Ms. Ahmad and most of the other patients were forced to sleep on the floor.  She was not evaluated by a physician for over 24 hours.  When she was finally evaluated, the doctor talked to her briefly, asked her a few questions, and told her she would be released.  Staff did not provide her with a treatment plan,

1    and did not arrange for any follow-up appointments.  Ms. Ahmad felt that she was "on [her]

2    own."

3         32.    Ms. Ahmad reports that, after her experience at John George, she spiraled into a

4    full-blown manic episode.  She could not sleep, kept seeing images of a needle coming at her,

5    and felt an intense fear of being admitted again.  The fear and anxiety she experienced after her

6    stay at John George made Ms. Ahmad feel as though her symptoms were worse than if she had

7    not been treated there.

8         33.    Ms. Ahmad was psychiatrically hospitalized additional times during the summer

9    of 2019, including again at John George.  Defendants did not take steps to provide Ms. Ahmad

10   with community-based crisis services, even though Ms. Ahmad would have strongly preferred

11   such care.  Ms. Ahmad was forced to sleep on a bench or the floor at John George's Psychiatric

12   Emergency Services ("PES") unit each time.  Upon discharge, AHS staff provided Ms. Ahmad

13   with prescriptions for medication, but did not provide her with a treatment plan.

14        34.    Ms. Ahmad sought treatment for herself.  Ms. Ahmad called ACCESS, Alameda

15   County's mental health information line, and asked for a referral to a community-based day

16   program like the one she successfully completed in 2016.  The ACCESS representative told Ms.

17   Ahmad that there were no such programs available to her in Alameda County.  Instead, ACCESS

18   connected Ms. Ahmad to an outpatient clinic in Alameda County which provides online

19   appointments with a psychiatrist and prescription refills, but not the intensive community

20   services she needs to help her manage her disability, such as day-program services, peer supports,

21   and social services.   There is a serious risk she will be re-institutionalized at John George if her

22   condition again deteriorates.  Ms. Ahmad is terrified of the prospect of relapsing and being

23   involuntarily admitted to John George again.  She describes the difference between receiving

24   mental health care in the community versus receiving it in an institutional setting as the

25   difference between "healing" and simply being "kept alive."

26                              **Rian Walter**

27        35.    Rian Walter is a 42-year-old Black Alameda County resident who graduated

28   from the University of California, Berkeley with degrees in Philosophy and English.  He

8

1   developed a mental health disability when he was 26-years-old.  Since his first psychotic episode,

2   Mr. Walter has had a long history of mood dysregulation and psychosis complicated by

3   insufficient outpatient mental health services, lack of housing, and untreated substance use

4   disorder.  He is enrolled in Medi-Cal and is currently an ACBHCS client.

5       36.     Since 2004, Mr. Walter has had over 170 contacts with the County's mental

6   health system, including approximately eighty-seven visits to John George and four admissions

7   to Villa Fairmont.  He has cycled in and out of John George numerous times.  He has been

8   institutionalized at Villa Fairmont on at least three different occasions.  He has been incarcerated

9   at Santa Rita Jail several times for charges related to his mental health symptoms.  He has also

10  been conserved on several occasions.

11      37.     Over the course of Mr. Walter's multiple psychiatric institutionalizations,

12  Defendants have consistently failed to provide him with effective discharge planning.  Without

13  being connected to needed community-based mental health services, Mr. Walter has

14  decompensated, each time leading to the next institutionalization.

15      38.     In contrast, during periods when Defendants have effectively connected Mr.

16  Walter to community-based mental health services, he has been able to live independently in the

17  community and avoid frequent psychiatric hospitalizations.

18      39.     Recently, the County re-connected Mr. Walter with a Full Service Partnership

19  program and assisted him in securing housing.  However, his shared housing situation does not

20  meet his substance use disorder needs, jeopardizing Mr. Walter's efforts to maintain his recovery.

21  Additionally, Mr. Walter has tried and been unable to get supported employment services from

22  the County.  Without supported housing that fits his needs, employment support, and other

23  needed services, Mr. Walter is at serious risk of re-institutionalization.

### **KG**[1]

25      40.     KG is a 57-year-old Black Alameda County resident who attended Mills College

26  and San Francisco State, and received her master's degree from the University of California,

---

28  [1] Plaintiff is using a pseudonym for this exemplar to protect the exemplar's privacy.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

785552.7

Berkeley.  KG used to have her own tutoring business.  She has a history of bipolar disorder, depression, and post-traumatic stress disorder ("PTSD").  She is enrolled in Medi-Cal and is currently an ACBHCS client.

41.     KG has had approximately 50 psychiatric hospitalizations, mostly at John George, since 1995.  KG cycled in and out of John George at least five times during 2019 alone.  She has also cycled in and out of Villa Fairmont and other psychiatric institutions in Alameda County.

42.     KG's mental health symptoms have been exacerbated by periods of homelessness, problems with her outpatient mental health service provider, periods of incarceration at Santa Rita Jail, and poor discharge planning from psychiatric institutions such as John George.

43.     KG is currently homeless and lacks community supports such as adequate case management services and supported housing.  Without access to needed intensive community services, KG is at serious risk of further unnecessary institutionalization by Defendants.

**MR**[2]

44.     MR is a 24-year-old motorcycle and photography enthusiast who wants to unite these passions in a career.  She has been diagnosed with bipolar disorder.

45.     MR has twice been admitted to John George.  In November 2019, after a period of struggling with her mental health, MR experienced a psychiatric emergency and was taken to John George and held for two nights.  MR looks back at this stay as one of the most traumatic experiences of her life.  MR felt frightened and unsafe as a result of the unsanitary conditions, overcrowding, and lack of medical attention in the Psychiatric Emergency Services unit at John George.

46.     MR was released from John George with no discharge plan whatsoever.  With no medical insurance, MR was unable to access needed mental health services.  After her stay,

---

[2] Plaintiff is using a pseudonym for this exemplar to protect the exemplar's privacy.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

785552.7

1    MR became severely physically ill, which she believes resulted from unsanitary conditions and

2    overcrowding at John George.

3         47.    In December 2019, MR's estranged, abusive husband contacted authorities

4    during a conflict knowing how traumatic MR's experience at John George had been.  Police

5    officers arrived and told MR she could either be arrested or be hospitalized at John George

6    again.  She was taken back to John George, even though she was not having a psychiatric

7    emergency.  MR again found herself in unhygienic, overcrowded, and frightening conditions.

8    This compounded her trauma from her first stay at John George.  MR again left without a

9    meaningful discharge plan: she was simply given a thirty-day supply of medication and

10   instructed to seek care from a psychotherapist.

11        48.    MR now has medical insurance and is receiving care from a psychologist and a

12   psychiatrist.  She has not returned to John George.  However, her brief stays have had a lasting

13   negative impact.  MR has been pursuing a degree in automotive photography.  While she was

14   being held at John George and while ill after her first stay, she fell behind in her coursework,

15   failed a class, and nearly lost one of her jobs.  Without adequate services moving forward, she is

16   at serious risk of re-institutionalization at John George.

17        49.    Ms. Ahmad, Mr. Walter, KG, and MR are just a few of the many DRC

18   Constituents who daily face a serious risk of unnecessary institutionalization.  Defendants' failure

19   to provide them adequate community-based mental health services has harmed them and places

20   them at serious risk of future harm.

21                                    **Defendants**

22        50.    Defendant County of Alameda (the "County" or "Alameda County") is a public

23   entity, duly organized and existing under the laws of the State of California.  The County has the

24   authority and responsibility to provide mental health treatment and services to County residents,

25   including DRC Constituents, either directly or through the administration of contracts with

26   providers.  Alameda County also operates Santa Rita Jail.  Alameda County is subject to Title II

27   of the ADA, and receives "federal financial assistance," thereby subjecting it to Section 504 of

28

785552.7

1   the Rehabilitation Act.  The County is funded directly or receives "financial assistance from the

2   state," thereby subjecting it to California Government Code Section 11135.

3        51.     Defendant Alameda County Behavioral Health Care Services ("ACBHCS") is

4   the County entity that provides mental health services to Alameda County residents.  ACBHCS is

5   subject to Title II of the ADA, and receives "federal financial assistance," thereby subjecting it to

6   Section 504 of the Rehabilitation Act.  ACBHCS also is funded directly or receives "financial

7   assistance from the state," thereby subjecting it to California Government Code Section 11135.

8        52.     Defendant Alameda Health System ("AHS") is a public hospital authority that

9   owns and operates John George Psychiatric Hospital, in addition to four other hospitals and four

10  wellness centers in Alameda County.  Defendant AHS contracts with ACBHCS to provide

11  psychiatric emergency and inpatient care at John George Psychiatric Hospital.  AHS is a public

12  entity subject to Title II of the ADA.  Defendant AHS receives "federal financial assistance,"

13  thereby subjecting it to Section 504, 29 U.S.C. §§ 794-794(a).  AHS is also funded directly or

14  receives "financial assistance from the state," thereby subjecting it to California Government

15  Code Section 11135.

16       53.     All Defendants are responsible for ensuring that people with serious mental

17  health disabilities are served in accordance with federal and state law, including the ADA,

18  Section 504, and Section 11135.

19                **STATUTORY AND REGULATORY FRAMEWORK**

20       54.     Title II of the ADA applies to all "public entities," including Defendants herein.

21  42 U.S.C. §12131(1)(b).  It provides that "no qualified individual with a disability shall, by

22  reason of disability, be excluded from participation in or be denied the benefits of services,

23  programs, or activities of a public entity or be subjected to discrimination by such entity."  42

24  U.S.C. § 12132.

25       55.     In enacting the ADA, Congress found that "historically, society has tended to

26  isolate and segregate individuals with disabilities, and, despite some improvements, such forms

27  of discrimination against individuals with disabilities continue to be a serious and pervasive

28  social problem[.]"  42 U.S.C. § 12101(a)(2).  Among the areas in which Congress found that

discrimination persists was "in ... institutionalization ... and access to public services[,]" 42 U.S.C. § 12101(a)(3).  "[I]ndividuals with disabilities continually encounter various forms of discrimination, including ..., segregation, and relegation to lesser services, programs, activities, benefits, jobs or other opportunities[.]" 42 U.S.C. § 12101(a)(5).  According to Congress, "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals."  42 U.S.C. § 12101(a)(7).

56.     Twenty-one years ago, the United States Supreme Court in *Olmstead v. L.C. ex rel. Zimring*, held that the unnecessary institutionalization of individuals with disabilities is a form of discrimination prohibited under Title II of the ADA.  527 U.S. at 597.  In so holding, the Supreme Court made clear that public entities must serve persons with disabilities in community-based, rather than institutional, settings when: (1) providing community-based services is appropriate; (2) the individual does not oppose receiving such services; and (3) the provision of community-based services can be reasonably accommodated, considering the resources available to the entity and the needs of other persons with disabilities.  *Id.* at 607.

57.     Regulations implementing Title II of the ADA and the *Olmstead* decision provide that "[a] public entity may not, directly or through contractual or other arrangements, utilize criteria or … methods of administration: (i) that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the entity's program with respect to individuals with disabilities; (iii) that perpetuate the discrimination of another public entity …."  28 C.F.R. § 35.130(b)(3); 28 C.F.R. § 41.51(b)(3); 45 C.F.R. § 84.4(b)(4).

58.     The regulations implementing Title II also require that public entities administer their services, programs, and activities in "the most integrated setting" appropriate to the needs of qualified individuals with disabilities.  28 C.F.R. § 35.130(d); 28 C.F.R. § 41.51(d).  The "most integrated setting" is the "setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible."  28 C.F.R. pt. 35, App. A, p. 450 (2010).

59.     Title II's "integration mandate" protects not only people who are currently institutionalized but also people with disabilities who are at serious risk of institutionalization. *See, e.g.*, *M.R. v. Dreyfus*, 697 F.3d 706, 720, 734 (9th Cir. 2012) (amended).  As the U.S. Department of Justice has explained:

> [T]he ADA and the *Olmstead* decision extend to persons at serious risk of institutionalization or segregation and are not limited to individuals currently in institutional or other segregated settings.  Individuals need not wait until the harm of institutionalization or segregation occurs or is imminent.  For example, **a plaintiff could show sufficient risk of institutionalization to make out an *Olmstead* violation if a public entity's failure to provide community services … will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution.**

*Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C.*, https://www.ada.gov/olmstead/q&a_olmstead.htm (last updated Feb. 25, 2020) ("Department of Justice Statement on Integration Mandate") (emphasis added).

60.     The integration mandate requires that public entities provide individuals with disabilities with "opportunities to live, work, and receive services in the greater community, like individuals without disabilities." *Id.*  Defendants must provide individuals such as the DRC Constituents with "opportunities to live in their own apartments or family homes, with necessary supports," as well as "expanding the services and supports necessary for [their] successful community tenure," rather than providing services in large congregate facilities.  *Id.*

61.     Section 504 of the Rehabilitation Act bans discrimination by recipients of federal funds, such as Defendants herein.  29 U.S.C. §§ 794-794(a).  It contains the same "integration mandate" and similar prohibitions against discrimination as Title II of the ADA.

62.     Likewise, California's non-discrimination statute prohibits discriminatory actions by the state and state-funded agencies or departments, and provides civil enforcement rights for violations.  Section 11135 states, in pertinent part:

> With respect to discrimination on the basis of disability, programs and activities subject to subdivision (a) shall meet the protections and prohibitions contained in Section 202 of the federal Americans with Disabilities Act of 1990 (42 U.S.C. § 12132), and the federal rules and regulations adopted in implementation thereof, except that if the laws of this state prescribe stronger

14

1       protections and prohibitions, the programs and activities subject to subdivision (a) shall be subject to stronger protections and prohibitions.

2

3    Cal. Gov't Code § 11135(b).

4       63.    Regulations implementing Section 11135 state that recipients of state funding

5 may not discriminate, either directly or through contractual arrangements, including by

6 "utiliz[ing] criteria or methods of administration that … have the purpose or effect of subjecting a

7 person to discrimination on the basis of … a physical or mental disability[.]" 2 C.C.R. §§ 11154,

8 11154(e) and (i)(1).  "It is a discriminatory practice for a recipient of State support to fail to

9 administer programs and activities in the most integrated setting appropriate to the needs of

10 qualified disabled persons."  *Id.* at § 11189.

11                  **FACTUAL ALLEGATIONS**

12       64.    Alameda County is a large, diverse county located in Northern California.  It is

13 home to a population of approximately 1.67 million residents and contains fourteen incorporated

14 cities (including Oakland, Berkeley, Fremont, Union City, Hayward, Alameda, Newark,

15 Pleasanton, and Dublin) and several unincorporated areas.  Alameda County's population is

16 approximately 32% Asian, 30% White, 22% Latinx, 11% Black, and 5% Biracial.  Within the

17 Bay Area, Alameda County has the highest percentage of people living in poverty.  The homeless

18 population has increased by 43% since 2017.

19       65.    Alameda County operates a mental health care system that is required by federal

20 and state law to provide treatment and services to County residents with mental health

21 disabilities, including DRC Constituents.  ACBHCS estimates that approximately 15,260

22 Alameda County residents have a serious mental health disability.

23       66.    ACBHCS is the agency responsible for implementing Alameda County's mental

24 health system, including executing the County's Medi-Cal Mental Health Plan and overseeing its

25 Mental Health Services Act ("MHSA") planning and spending.  ACBHCS contracts with

26 numerous community-based organizations and businesses to provide care.  ACBHCS also

27 contracts with AHS to provide psychiatric emergency and inpatient care at John George

28 Psychiatric Hospital.

785552.7

67.     Federal and state law require that Alameda County's mental health system include community-based services that prevent unnecessary institutionalization and the risk of such institutionalization.[3]  Under California law, a primary goal of community-based "systems of care" is to serve adults with serious mental health disabilities who are homeless, involved in the criminal system, or require acute treatment.  Cal. Welf. & Inst. Code § 5600.3(b).

68.     Nationally, the intensive community services that are recognized as critical and effective in enabling individuals with serious mental health disabilities to avoid unnecessary institutionalization include: Full Service Partnerships/assertive community treatment,[4] rehabilitative mental health services, intensive case management, crisis services, substance use disorder treatment,[5] peer support services, supported housing, and supported employment.  The references to "community services" and "community-based services" throughout this Complaint are references to these specific services.  Each of these services is described in further detail in Section III, *infra*.

69.     DRC opened an investigation into Alameda County's practices regarding unnecessary institutionalization in 2018.  During its investigation, DRC visited numerous mental health facilities and programs throughout Alameda County, including several visits to John George and Villa Fairmont.  DRC also visited the Santa Rita Jail and various homeless shelters, and consulted with providers of supported housing.  In each of these instances, DRC and its designated agents toured the facilities and interviewed residents, including DRC Constituents,

---

[3] The provision of needed community services is authorized and funded (using federal, state and local monies) under a number of California programs, including: the Bronzan-McCorquodale Act, Cal. Welf. & Inst. Code §§ 5600, *et seq.*; Medi-Cal Specialty Mental Health Services, Cal. Welf. & Inst. Code §§ 14700, *et seq.*; 9 C.C.R. §§ 1810.100, 1810.247; Mental Health Services Act, Proposition 63 (2003); and California's Medi-Cal program, Cal. Welf. & Inst. Code §§ 14000 *et seq.*, 22 C.C.R. §§ 50000, *et seq.*

[4] As discussed in further detail in Section III, *infra*, in California, Full Service Partnership programs ("FSPs") provide "whatever it takes" to promote recovery for targeted, high needs individuals.  Most FSPs use the "ACT model" as the primary mode of services delivery – which includes teams of professional and peers who deliver a full range of services to clients in their homes or the community.

[5] Many who experience a mental health disability during their lives will also experience a substance use disorder and vice versa.

1  and providers.  DRC submitted numerous Public Records Act requests to Defendants related to

2  the provision of mental health care in Alameda County and unnecessary institutionalization.

3        70.        On November 1, 2019, DRC found probable cause to believe that the County's

4  actions constitute abuse and/or neglect of DRC Constituents based on, *inter alia*, Defendants'

5  failure to provide them needed services and supports in the most integrated setting appropriate, in

6  order to promote their recovery.[6]

7        71.        DRC's investigation revealed that Defendants have not provided sufficient

8  intensive community-based mental health services to DRC Constituents, and are causing them,

9  particularly Black DRC Constituents, to be unnecessarily segregated in costly, publicly funded

10  institutions, often repeatedly.

11  **I.        Defendants Unnecessarily Segregate DRC Constituents Into Psychiatric Institutions.**

12        72.        Under California's civil commitment laws, a DRC Constituent can be detained

13  for up to 72 hours based on a statement by certain County staff that they have reason to believe

14  that the person, due to a mental health disability, is gravely disabled or a danger to themselves or

15  others.[7]  California's civil commitment laws also authorize county behavioral health systems,

16  including Defendant ACBHCS, to designate which facilities to use for the evaluation and

17  treatment of individuals.

18        73.        Alameda County detains more individuals for psychiatric evaluation and

19  treatment than any other county in California.  Its psychiatric detention rate is three-and-a-half

20  times higher than the statewide average.

21        74.        Because Defendants' community-based services are insufficiently available, the

22  County detains vast numbers of DRC Constituents in crisis at John George, the designated public

[6] *See* App. A, DRC, Ltr to ACBHCS and Alameda County Re: DRC Abuse/Neglect Investigation and Request for Information Alameda County's Mental Health System (Nov. 1, 2019).

[7] Cal. Welf. & Inst. Code § 5150(a).  After the 72-hour period, detained individuals must either be released, provided treatment on a voluntary basis, certified for intensive treatment under Welfare & Institutions Code section 5250, or appointed a conservator or temporary conservator under Welfare & Institutions Code section 5152.

785552.7

1    hospital authority, pursuant to California Welfare & Institutions Code sections 5150 and 5250.

2    More than 10,000 people have passed through the facility since January 2018.

3          75.      At John George, there are three locked inpatient units and a locked Psychiatric

4    Emergency Services ("PES") unit.  The psychiatric hospital is large, crowded, and physically

5    isolated from community life.

6          76.      A shockingly high number of DRC Constituents, especially Black DRC

7    Constituents, are held in these locked institutional facilities repeatedly and for periods longer

8    than necessary.

9        **A.**      <u>**Unnecessary Institutionalization in John George's PES Unit.**</u>

10         77.      Defendants detain nearly 1,000 people at John George's PES unit every month.

11    Through its investigation, DRC learned that these numbers are 30% higher than they were a

12    decade ago.

13         78.      A disproportionate number of individuals held in the PES—36%—are Black.

14    This is more than three times their overall composition in Alameda County.  The County's data

15    also shows that Black men are nearly 30% more likely than others to be involuntarily

16    institutionalized in the wake of a mental health crisis call.

17         79.      An enormous number of the people taken to PES need not be detained there at

18    all.  According to the County's own estimates, more than 75% of those detained in PES do not

19    meet medical necessity criteria for inpatient psychiatric services.

20         80.      At PES, Defendants crowd DRC Constituents into a locked 35-foot-by-45-foot

21    room, illuminated by harsh fluorescent lights, where they must compete for places to sit, lie, or

22    stand.  The room can be filled with upwards of sixty (60) people with mental health disabilities,

23    some of whom are relegated to hallways or the floor due to overcrowding.  Ms. Ahmad describes

24    the common room as "filthy" and "smelling like urine."  The facility's harsh institutional

25    conditions often exacerbate rather than alleviate people's mental health symptoms.  MR

26    experienced sexual harassment while she was held there.  Staff did not intervene until she

27    advocated for herself loudly and repeatedly.  She was forced to take such large doses of Ativan—

28    an anxiety medication—that she experienced withdrawal symptoms after being discharged.

81.     Once detained in PES, DRC Constituents languish until they are released or referred to one of John George's inpatient units or another facility.  Many DRC Constituents spend fewer than twenty-four hours at the PES, but a significant number remain for multiple days.  Some remain in the PES for more than a week.

82.     The majority of DRC Constituents detained in the PES are released without adequate intensive community-based services in place, resulting in their re-institutionalization, often repeatedly.  One Alameda County Mental Health Board report noted a "vicious cycle of overcrowding" at the PES, and "patients being discharged and being readmitted when they fail to function outside the hospital setting."[8]

**B.     Unnecessary Institutionalization in John George's Inpatient Units.**

83.     Approximately twenty-five (25) percent of those brought to PES are admitted to John George's inpatient units.  In recent years, the average daily census and average length of stay in John George's inpatient units have risen, with an estimated 5,000 patient visits in 2019, and an average length of stay of approximately nine days.

84.     John George's inpatient units are highly institutional settings.  DRC Constituents are confined in locked wards, monitored continuously, afforded little privacy or autonomy over their daily lives, and required to abide by rigid rules.

85.     Defendants needlessly extend DRC Constituents' institutionalization at John George due to the lack of available community-based services.  These extended stays—which are considered "administrative" because they are not medically necessary—last several days or more, harm DRC Constituents, and cost millions of dollars in public monies.  Even after "administrative" stays, DRC Constituents are often released without being linked to adequate intensive community-based services, resulting in their re-institutionalization.

**C.     Unnecessary Institutionalization in Villa Fairmont's Sub-Acute Units.**

86.     Defendants discharge large numbers of DRC Constituents from John George's inpatient units to Villa Fairmont for an additional period of institutionalization.  Villa Fairmont is

---

[8] *See* Darwin BondGraham, *Overwhelmed*, East Bay Express (Mar. 9, 2016), https://www.eastbayexpress.com/oakland/overwhelmed/Content?mode=print&oid=4705660.

785552.7

a 96-bed, locked "sub-acute" mental health facility located on the same campus as John George. Defendant ACBHCS contracts with Telecare Corporation to operate this facility.

87.     Villa Fairmont is an institution similar in many ways to John George.  DRC Constituents are subjected to around-the-clock monitoring and are restricted from leaving the facility.

88.     Due to a lack of intensive community services, Defendants Alameda County and ACBHCS often keep DRC Constituents at Villa Fairmont beyond the time staff deems appropriate.  These extended stays are damaging to DRC Constituents and costly to Defendants.

## II.     DRC Constituents Are at Serious Risk of Unnecessary Institutionalization.

89.     Without access to needed intensive community services, DRC constituents are at serious risk of repeated cycles of unnecessary institutionalization.

90.     Defendants detain hundreds of DRC Constituents at John George repeatedly. According to the County's data, from January 2018 to June 2020, Defendant AHS held more than 350 DRC Constituents in the PES over ten (10) times.  Among this group, 55% were Black. During that same time period, Defendant AHS held approximately eighty-four (84) individuals twenty-five (25) times or more; close to 60% were Black.  Six cycled in and out of the PES more than eighty-five (85) times in this two-and-half year period; five of them were Black.

91.     Repeat admissions to John George's inpatient Units and to sub-acute facilities such as Villa Fairmont are also common among DRC Constituents.  For example, since 2018, the County's data shows that at least 365 DRC Constituents have each been admitted to John George's Inpatient Units four (4) or more times.  Approximately 44% of this group are Black.

92.     The high rate of re-institutionalization is directly related to Defendants' failure to provide DRC Constituents with needed intensive community-based services upon discharge from PES, John George's inpatient units, and sub-acute facilities such as Villa Fairmont.  The County itself has admitted that the majority of people discharged from PES are "not linked to planned services and continue to over-use emergency services."

93.     The risk of unnecessary institutionalization and re-institutionalization is particularly serious for people experiencing homelessness or who have been incarcerated.

A.      **DRC Constituents Without Stable Housing Are at Serious Risk of Unnecessary Institutionalization.**

94.      As of 2019, approximately 2,567 people experiencing homelessness in Alameda County—or 32% of the County's homeless population—identified as having a serious mental disability.

95.      Despite state law and policy that discourages discharging people from psychiatric institutions to the streets or emergency shelters,[9] Defendants frequently discharge DRC Constituents from psychiatric institutions such as John George and Villa Fairmont to homelessness.  Some DRC Constituents end up in emergency shelters, if there are shelter beds available.  Others end up in homeless encampments crammed under overpasses in unsafe and degrading conditions.  The *New York Times* recently described the homeless encampments in Alameda County as "among the world's most dire places."[10]

96.      The vulnerability of Black DRC Constituents to unnecessary institutionalization is exacerbated by the fact that they comprise approximately 47% of the unhoused population in Alameda County.

97.      DRC Constituents who are homeless are deeply vulnerable to violence and trauma while living outside.  Homelessness itself is a traumatic experience that aggravates the effects of mental health disabilities.

98.      By discharging DRC Constituents into homelessness, Defendants increase their risk of re-institutionalization.

99.      The County has acknowledged that, for DRC Constituents experiencing homelessness, psychiatric hospitalization is among "the most frequent—and the most expensive—source of [their] medical care."

---

[9] Cal. Health & Safety Code § 1262.5(n)(3) (requiring discharge planning for homeless patients that "that helps prepare the homeless patient for return to the community by connecting him or her with available community resources, treatment, shelter, and other supportive services").

[10] Thomas Fuller & Josh Haner, *Among the World's Most Dire Places: This California Homeless Camp*, N.Y. Times (Dec. 17, 2019), https://www.nytimes.com/interactive/2019/12/17/us/oakland-california-homeless-camp.html.

100.     Mr. Walter's experiences illustrate these challenges.  From 2015 to 2017, Mr. Walter was homeless and without access to outpatient mental health services.  During this time, Mr. Walter was assaulted, stranded naked, forced to dig through garbage bins for scraps of food, and almost shot.  Mr. Walter was so afraid for his safety that he would frequently use methamphetamine just to stay awake as long as possible.  Over the two years that Mr. Walter lacked housing, Mr. Walter was institutionalized at John George on forty-three (43) occasions.  In one year alone, Mr. Walter was institutionalized thirty-one (31) times, and seven (7) times in one month.  Despite the high number of involuntary psychiatric admissions, Defendants failed to provide Mr. Walter with stable housing or intensive mental health services.

**B.     DRC Constituents Who Have Been Incarcerated or Had Other Involvement with the Criminal System Are at Serious Risk of Unnecessary Institutionalization.**

101.     Without access to sufficient intensive community services, DRC Constituents, particularly Black DRC Constituents, are highly likely to experience arrest and incarceration in the County's jail solely for disability-related behaviors.  This compounds their risk of future psychiatric institutionalization.

102.     Approximately 53% of people—484 out of 919—whom the County identifies as both "justice involved" and a "high utilizer" in the mental health system are Black.  ("High utilizer" is a status generally assigned to people with repeated psychiatric institutionalizations.)

103.     Hundreds of DRC Constituents discharged from John George end up in jail shortly after their release.  According to County data, from January 2018 to mid-December 2019, nearly 200 DRC Constituents discharged from John George's inpatient units were jailed within the next sixty (60) days.  DRC's investigation determined that, for many, the time from discharge to incarceration was less than two (2) weeks.

104.     The County—which runs the jail—is aware that many DRC Constituents are arrested and detained at the County's jail for behaviors relating to their mental health condition.  Typically, DRC Constituents are incarcerated in jail for minor offenses including minor probation violations.  Often charges are dropped or the DRC Constituents accept a plea deal

1  allowing their release for time-served.  If needed intensive community services were available,

2  many of these individuals would be able to avoid incarceration.

3       105.    Once entangled in the criminal system, DRC Constituents tend to stay in jail

4  longer than other jail prisoners, are at greater risk of deteriorating psychologically and

5  committing acts of self-harm, and more frequently receive punishments in response to minor

6  infractions.  Approximately one-quarter of the people held in the County's jail population have

7  been identified as having a "serious mental illness."[11]  Half of the people receiving mental health

8  services from the County while in jail are Black.

9       106.    It is well known that people with mental health disabilities held in the County's

10 jail face dangerous and damaging isolation and inadequate access to mental health treatment,

11 including discharge planning.  *See Babu v. Cnty. of Alameda*, Case No. 18-07677 (N.D. Cal filed

12 Dec. 21, 2018); *Babu v. Cnty. of Alameda*, Case No. 18-07677, Notice Re: Final Joint Expert

13 Reports, ECF No. 111 (N.D. Cal., Apr. 22, 2020).  A large number have died while in jail.[12]

14      107.    Defendant ACBHCS is responsible for providing mental health treatment to jail

15 prisoners, except for inpatient care at John George, which Defendant AHS provides.  Defendants

16 ACBHCS and AHS's failures to provide adequate mental health services, including discharge

17 planning, put people at serious risk of institutionalization upon release from incarceration.  These

18 failures also put people at risk of re-arrest.

19      108.    The County and ACBHCS recognize that "[a] large percentage of individuals

20 with [mental health disabilities] released from County jail in Alameda County do not receive the

21 services needed to connect them to the treatment and resources that help prevent recidivism."

22 The joint mental health expert in the *Babu* case identified several deficiencies with the jail's

23

---

24 [11] A "serious mental illness" is another term for "serious mental health disability" and is generally
defined as "a mental, behavioral, or emotional disorder resulting in serious functional impairment,

25 which substantially interferes with or limits one or more major life activities."  Nat'l Inst. of
Mental Health, Mental Health Information, https://www.nimh.nih.gov/health/statistics/mental-

26 illness.shtml.

27 [12] *See, e.g.*, Lisa Fernandez, *A look at the 45 inmates who have died at Santa Rita Jail in the last
five years*, KTVU Fox 2 (Oct. 4, 2019), https://www.ktvu.com/news/a-look-at-the-45-inmates-

28 who-have-died-at-santa-rita-jail-in-the-last-five-years.

discharge planning, concluding that it "should include coordination with community services" to prevent further cycling.[13]

109.    As but one example, KG was recently imprisoned at Santa Rita Jail for a misdemeanor related to her mental health symptoms.  She was then transferred to John George where she was involuntarily institutionalized for fourteen days, after which she was discharged and returned to Santa Rita Jail.  Following her incarceration, KG was released without any connection to mental health services or housing supports.  KG worries that she will be involuntarily institutionalized at John George or Santa Rita again.

**III.    Defendants Fail to Provide Needed Community-Based Services.**

110.    Defendants Alameda County, ACBHCS, and AHS are the primary and interconnected sources of mental health services for DRC Constituents, and therefore each carries responsibility for DRC Constituents' unnecessary institutionalization and/or serious risk of institutionalization.

**A.    Defendants Alameda County and ACBHCS Fail to Provide Needed Full Service Partnerships, Supported Housing, and Other Intensive Community-Based Services.**

111.    DRC Constituents are qualified to receive mental health services in the community, in settings far more integrated than John George and Villa Fairmont.

112.    The County and ACBHCS fail to provide DRC Constituents with the community services they need, including Full Service Partnerships and/or comparable intensive services and supported housing.  Some DRC Constituents receive *some* of the services they need *some* of the time.  However, Defendants deny a vast number of DRC Constituents the intensive community services they need to avoid institutionalization in John George and Villa Fairmont, or detention in jail.

---

[13] Evaluation of Mental Health Delivery at the Alameda County Sheriff's Office Santa Rita Jail, Kerry Hughes, M.D., ECF No. 111-3 at 27.

1.      **Insufficient Full-Service Partnerships and Comparable
          Intensive Services.**

113.    Most DRC Constituents who are cycling in and out of John George, Villa Fairmont, or other psychiatric institutions in the County are eligible for Full Service Partnership ("FSP") services or comparable intensive services.

114.    FSP services are targeted to individuals with serious mental health disabilities who are homeless, involved in the criminal system, and/or frequent users of hospital or emergency room services or are at risk of such.  9 C.C.R. §3620.05.

115.    FSPs are comprised of multidisciplinary teams that develop a collaborative relationship with a client and provide a full spectrum of community services so the client can achieve identified goals.  9 C.C.R. §3200.130.  The foundation of the FSP program is doing "whatever it takes" to help individuals (called "partners") on their path to recovery and wellness. In Alameda County, Defendants report that the FSP program has helped support people in "getting off the streets, getting benefits such as insurance and social security, becoming psychiatrically stable, reducing interactions with the criminal justice system and emergency services, improving overall physical health …, and integrating into the community as employees, students, volunteers, and advocates."

116.    The specific intensive community services that DRC Constituents need to stop unnecessary institutionalization can be provided as an integrated part of the FSP model or as separate services.  These services include: assertive community treatment, rehabilitative mental health services, intensive case management, crisis services, substance use disorder treatment, peer support services, and supported employment.

a.      **Assertive Community Treatment** ("ACT") is a widely used evidence-based practice.  ACT services are available 24 hours per day, 7 days a week, with someone always available to handle emergencies.  These services are provided at home, at work, and/or in other settings, with the goal of providing individuals adequate community care and helping them with community life.  Teams provide individuals with whatever services they need for as long as they need them.

b.      **Rehabilitative Mental Health Services** is a broad category of services that includes assessment and plan development, medication management, and individual or group therapies and education to increase independence and self-sufficiency.

c.      **Intensive Case Management**, including Targeted Case Management,[14] helps individuals gain access to needed medical, social, educational, and other services, including through face-to-face encounters.  It supports the assessment and periodic reassessment of individual needs and the development of an individualized care plan, and includes monitoring of whether the care plan is being properly implemented and whether it is successful and if not, securing adjustments to the plan.

d.      **Crisis Services** include mobile crisis services and community-based residential crisis services, such as crisis homes or apartments.  Mobile crisis services are provided by teams of mental health professionals who respond quickly to individuals in crisis and utilize a variety of techniques to de-escalate the situation and resolve the crisis.

e.      **Substance Use Disorder Treatment** includes individual and group services, including medication assisted therapy ("MAT"), outpatient and residential treatment, counseling and therapy, and peer support services.

f.      **Peer Support Services** are provided by individuals with lived experience in the mental health system who build relationships of trust with those they serve. They help people with mental health disabilities stay connected to treatment providers, maintain or develop social relationships, and participate in community activities.  They help individuals transition to the community from institutional or correctional settings.

g.      **Supported Employment/Independent Placement and Support** ("IPS") helps people with mental health disabilities obtain and keep a job.

117.     Defendant ACBHCS is required to provide all of these services through Medi-Cal and the Mental Health Services Act.

---

[14] The term "targeted case management" means "services that assist a beneficiary to access needed medical, educational, social, prevocational, vocational, rehabilitative, or other community services."  9 C.C.R. §1810.249.

785552.7

118.     Unfortunately, many DRC Constituents who need FSP services or comparable intensive services do not receive them.

119.     The County's existing FSP programs are constrained by limited capacity and lack coordination and resources.  Defendants fail to inform many eligible beneficiaries and referral agencies about FSP services.  In addition, the process for assessing eligibility for and authorizing FSP services is so cumbersome that many DRC Constituents experience escalating crises and dire outcomes while awaiting a determination.  Many are institutionalized, become homeless, or are jailed.

120.     Existing FSPs also fail to provide DRC Constituents with access to the full range of services they need to shorten or avoid institutionalization, such as community-based crisis services and treatment for people with co-occurring substance use disorders.  Defendants have for years relied heavily, and almost exclusively, on John George Psychiatric Hospital to serve people with mental health disabilities who may be experiencing a psychiatric crisis. Alameda County only recently opened a Crisis Stabilization Unit ("CSU").[15]  This CSU, which has twelve (12) beds, is the only one in the County, though the need for crisis beds is far greater. Other recent initiatives to enhance crisis services in the County, including short-term crisis residential treatment programs, drop-in Crisis Response Programs, and a Mobile Crisis Unit, are insufficient to meet the need for such services and have significant limitations in their capacity, hours of operation, and geographic accessibility.

121.     The scarcity of FSP and similarly intensive services is especially acute for individuals who have health needs beyond their mental health disabilities.  For instance, in all of Alameda County, there is only one dual diagnosis residential treatment program for people with mental health disabilities and substance use disorders, and it serves only eight (8) Alameda County residents at a time.  DRC Constituents with dual diagnoses also report needing additional intensive case management services, more time in dual diagnosis treatment programs, and mobile

---

[15] Crisis Stabilization Units offer an alternative to psychiatric hospitalization by providing crisis response and observation services in a community-based setting.

785552.7

treatment teams that proactively address individuals' co-occurring mental health and substance use.

### 2.   Lack of Supported Housing.

122.   FSPs, or similarly intensive services, are often paired with Supported Housing.[16] Supported housing typically includes two components: (1) a rental subsidy for the individual with a mental health disability, and (2) services to support the individual's successful tenancy. Assistance finding and securing housing is also available.  The support services can include case management, training in independent living skills, medication management, home health aides, and/or other services.  The Department of Justice, and often courts in *Olmstead* cases, refer to such housing as "supported housing."[17]

123.   The California legislature has found that "[h]ousing is a key factor for stabilization and recovery to occur and results in improved outcomes for individuals living with a mental illness."  Cal. Welf. & Inst. Code § 5849.1 (West).  It has also found that tenants of permanent supported housing "reduced their visits to an emergency department by 56 percent, and their hospital admissions by 45 percent."  *Id.*  Historically, the FSP Housing Support Program in Alameda County has "demonstrated reductions in inpatient … per client costs by an average of more than $50,000/year."

124.   DRC Constituents consistently report that the lack of supported housing in Alameda County is one of the greatest challenges they face and a significant barrier to their stabilizing and managing their mental health conditions.

---

[16] Housing is included in the "full spectrum of services" provided under FSPs, which includes, but is not limited to "rental subsidies, housing vouchers, house payments, residence in a drug/alcohol rehabilitation program and transitional and temporary housing."  9 C.C.R. § 3620(a)(1)(B)(iii).  California Welfare and Institutions Code section 5892.5 defines "housing assistance" to include rental assistance, operating subsidies, move in costs and utility payments, as well as capital funding to build or rehabilitate housing for homeless or at-risk persons with mental health disabilities.

[17] Department of Justice Statement on Integration Mandate at 7 ("*Olmstead* remedies should include, depending on the population at issue, supported housing.").

125.    Despite examples of successful supported housing in the County, Defendants Alameda County and ACBHCS fail to provide sufficient supported housing services to meet the needs of DRC Constituents.  Recent data show that there were approximately 300 permanent supported housing slots in Alameda County dedicated to people with serious mental health disabilities, even though the number of homeless adults with serious mental health disabilities in the County is estimated to exceed 2,500, and the number who have serious mental health disabilities and are "chronically homeless"[18] is over 1,500.

126.    According to ACBHCS, "[a] number of Full-Service Partnership (FSP) providers have reported that the lack of affordable housing is a major challenge for many FSP clients and this is reflected in the increase in homelessness."  Many service providers have underscored the enormity of this problem.  In the words of one mental health provider:

> The lack of affordable subsidized housing in Berkeley and Alameda County is a huge issue for many people served by the mental health division.  A sizable number of those who enter care in the division are homeless, and the lack of housing options provides a huge barrier to moving individuals forward in their recovery.

127.    Many DRC Constituents experience periods of homelessness or face significant challenges related to their housing that contribute directly to their being involuntarily hospitalized at John George or taken to jail.  For example, KG did not have any psychiatric admissions for five years while living in Section 8 housing.  In 2018, however, KG lost her Section 8 housing after her FSP provider failed to engage and assist her.  Since that time, KG has had at least ten psychiatric hospitalizations and the County and ACBHCS have failed to re-connect her with housing.

### 3.    Lack of Culturally Congruent and Responsive Community Services.

128.    In order for FSP programs, other intensive services, and supported housing programs to be accessible to DRC Constituents from diverse racial and ethnic groups, these

---

[18] "Chronically homeless" refers to individuals who are currently homeless and have been homeless for six months or more in the past year.

785552.7

programs and services must be provided in a culturally congruent and responsive manner.[19] Specifically, these community services and programs must be delivered in ways that acknowledge the various traumas that DRC Constituents have experienced and advance a person-centered approach to providing services.  For example, peers providing services can be more effective when they share the cultural background of and have lived experiences similar to those being served.  All staff providing services need to understand the cultural norms and socio-economic challenges of DRC Constituents.

129.     Defendants have a longstanding policy or practice of failing to provide intensive community services in ways that are culturally congruent and affirming.  This failure has a disproportionate impact on people of color and Black residents in particular, leading to even higher rates of unnecessary institutionalization of Black DRC Constituents compared to people from other racial and ethnic groups.

130.     Defendants are well aware of this problem.  In the words of former ACBHCS director Marye L. Thomas, M.D., "most behavioral health care programs in California serve African Americans at a disproportionately higher rate than other ethnic communities, and these services are provided in extremely restrictive (often involuntary) settings such as hospitals and jails."  Dr. Thomas acknowledged that, "[d]espite this 'over-provision' of services, across the lifespan, positive mental health outcomes among African Americans in Alameda County … are inconsistent, which leads us to conclude that many African Americans are being inappropriately served."

---

[19] Programs that rely strictly on evidence-based practices may not be accessible to racial or ethnic minority groups if the studies they are based upon did not account for the cultural orientation of those communities.  *See, e.g.*, V. Diane Woods, et al., "We Ain't Crazy! Just Coping with a Crazy System:" Pathways into the Black Population for Eliminating Mental Health Disparities (2012) (discussing culturally congruent mental health services for Black communities in California), https://lhc.ca.gov/sites/lhc.ca.gov/files/Reports/225/ReportsSubmitted/CRDPAfricanAmericanPopulationReport.pdf.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

785552.7

**B.** **Defendant AHS Fails to Ensure Effective Linkages and to Coordinate Care with the County and ACBHCS.**

131.     Defendants Alameda County and ACBHCS's failure to provide needed community-based services to DRC Constituents, particularly Black DRC Constituents, is compounded by Defendant AHS's failure to develop individualized treatment and discharge plans, to ensure their timely and effective implementation, and to coordinate with the County, ACBHCS, and community-based services providers.

132.     Through operating John George, AHS serves as a critical component in Alameda County's mental health system, including with respect to patient intake, assessment, referral, admission, and discharge.

133.     AHS's role and specific responsibilities with respect to the operation of the County's public mental health system are set forth in detail in the AHS-ACBHCS master contract.  This document provides considerable guidance as to AHS's *Olmstead*-related obligations.  For example, AHS is responsible for:

a.     "Facilitat[ing] … a patient's ability to return to less restrictive treatment in the community[;]"

b.     "Evaluat[ing] … continuity and coordination of care[;]"

c.     "[E]xtensively review[ing ] clinical and treatment history and communicate with community services providers to ... optimize treatment and discharge planning and reduce the likelihood of inpatient recidivism or multiple PES admissions[;]"

d.     "[C]ollaborat[ing] with BHCS's Community Placement Specialist and other system administrators in the development and/or implementation of a discharge or system-wide care plan for selected patients needing special management and coordination[;]" and

e.     "[P]articipat[ing] in BHCS' comprehensive analysis to assess and recommend changes in the administration, management, policies, operations, relationships and accountability of Information and Referral, Crisis and Emergency Services which serve as entry points to BHCS's System of Care."

785552.7

134.     In practice, Defendant AHS fails to adequately consult and coordinate with community providers and ACBHCS case managers, physicians, and other personnel in the admission, diversion, referral, treatment, and discharge of patients.

135.     Defendant AHS fails to develop adequate individualized treatment and discharge plans of DRC Constituents.  Defendant AHS's discharge plans are frequently boilerplate and disconnected from what DRC Constituents need in order to live successfully in the community.  Many DRC Constituents are discharged to insecure housing or homelessness and are not adequately connected to mental health care.

136.     Defendant AHS's practices significantly contribute to DRC Constituents' institutionalization and have led to numerous DRC Constituents decompensating soon after being discharged from John George, leading to additional institutionalizations.  For instance, in May 2019, AHS staff discharged Mr. Walter from the John George PES unit without sufficient coordination with community-based mental health providers, and Mr. Walter was forced to return to John George the very same day on an involuntary hold.  Ms. Ahmad and MR also recall being discharged from the John George PES without any meaningful discharge plans, and then cycling through PES again within a short period of time.  Ms. Ahmad, Mr. Walter, and MR all believe that their repeat hospitalizations were unnecessary and avoidable.

**IV.    Defendants' Practices Harm DRC Constituents.**

137.     Defendants' failure to provide and link DRC Constituents to needed intensive community-based services has devastating effects.  DRC Constituents do not receive the services they need to stabilize their conditions, and they live at constant and high risk of unnecessary institutionalization.

138.     Ms. Ahmad believes that her stays at PES contributed to her developing post-traumatic stress disorder and prolonged her recovery.  Ms. Ahmad thinks that, if Defendants had provided her with community-based services, she could have avoided being institutionalized multiple times in one summer.

139.     MR believes her experience at John George caused her to fail a higher education course and almost lose a job.

32

140.     Mr. Walter and KG have experienced dozens of unnecessary institutionalizations, which they believe contributed to instability in their housing and stigmatization by family members and service providers, which has made them feel further isolated.

## V.     Defendants' Response to the Covid-19 Pandemic Puts DRC Constituents at Heightened Risk of Harm.

141.     Defendants' practices place DRC Constituents at especially grave risk from the COVID-19 pandemic.

142.     As of July 17, 2020, more than 100 Santa Rita Jail prisoners were infected with COVID-19.[20]  The number of cases went from six to 101 in three days.

143.     Even though Defendants have initiated social distancing protocols at John George and Villa Fairmont in response to COVID-19, there remains a significant risk of COVID-19 infection spreading through these institutions, just as it has done in Santa Rita and many other psychiatric hospitals, detention centers, and nursing facilities throughout the country.  While John George has limited the PES unit to accepting 25 patients at a time, those admitted to PES still sit in close proximity to one another for several hours.  In John George's inpatient units and at Villa Fairmont, rooms have multiple beds and sealed windows, hallways are narrow, staff move between wards, and alcohol-based hand sanitizer is not readily available (and may not be kept on hand by residents on the grounds as it is considered an ingestion hazard).

144.     Due to the spread of COVID-19 at Santa Rita Jail, many DRC Constituents are at high risk of contracting and dying from infection.  Individuals with serious mental health disabilities have significantly higher risks of cardiovascular disease, diabetes, HIV, tuberculosis, and Hepatitis B and C.  In addition, many DRC Constituents are older adults and/or take medications that may compromise their immune systems.

---

[20] Angela Ruggiero, *More Than 100 Santa Rita Jail Inmates Now Infected with Coronavirus*, Mercury News (July 17, 2020, 5:08pm), https://www.mercurynews.com/2020/07/17/nearly-100-inmates-now-infected-with-coronavirus-in-santa-rita-jail-outbreak/.

785552.7

145.     Recent data indicates that the coronavirus death rate among Black, Native, and Latinx people is substantially higher than that of other groups, and that rates of depression and anxiety have spiked among Black people since the pandemic began.  These factors compound the racial disparities already present in the County's mental health system and put people of color at heightened risk for negative health outcomes.

146.     Given the grave risk of infection for DRC Constituents who cycle between jail, John George, Villa Fairmont, and homelessness, DRC Constituents need intensive community-based mental health services now more than ever.  The community-based services that protect DRC Constituents from unnecessary institutionalization also limit their exposure to COVID-19.

**VI.** **Defendants Can Provide Services to DRC Constituents in Integrated, Community Settings by Reasonably Modifying the Mental Health Service System.**

147.     The County's mental health system does not provide intensive community-based services in a timely manner or at a sufficient level.

148.     With reasonable modifications to Alameda County's mental health system, Defendants would be able to meet DRC Constituents' service needs and prevent their unnecessary institutionalization.  Such modifications include:  conducting a systemwide assessment of the community-based service needs of DRC Constituents with input from the Constituents themselves; ensuring the effective coordination and provision of existing community-based services; expanding the capacity to provide needed intensive community-based services; relocating services from institutions to community-based settings; outreach to and engaging DRC Constituents in services; and maximizing federal, state, and local funding, including through Medi-Cal.

149.     Defendants could also redirect spending from segregated, institutional settings to community-based programs.  Publicly available records show that the average cost per John George PES visit is $3,010.  The average cost per day for a John George inpatient hospitalization is $2,602, and a daily stay at Villa Fairmont costs close to $400 per day.  For people with a mental health disability who are chronically homeless, the average length of John George

34

psychiatric hospitalization is more than eight (8) days, costing more than $20,000 in public monies.  At Villa Fairmont, the average stay of four (4) months costs $48,000.

150.    In 2019, the County spent 30% of its entire mental health budget on about 800 individuals with the highest utilization of public mental health services in the County.  Fully 70% of those dollars were spent on institutional care at John George and Villa Fairmont and mental health services in jail.  Upon information and belief, it would cost the County far less to provide these individuals, who are DRC Constituents, with community services—even the most intensive and expensive community services available.

151.    Ultimately, serving DRC Constituents in the least restrictive and most integrated setting possible in the community is not only legally required and more humane, it is also financially feasible.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of Title II of the ADA**
**Failure to Provide Services in the Most Integrated Setting Appropriate**
**42 U.S.C. §§ 12131 *et seq.*, 28 C.F.R. § 35.130**

152.    Plaintiff repeats and incorporates by reference the preceding paragraphs of this Complaint as if set forth in full herein.

153.    DRC Constituents are qualified individuals with disabilities within the meaning of Title II of the ADA and meet the essential eligibility requirements for the receipt of services, programs, or activities of Defendants.  42 U.S.C. § 12131(2).

154.    Defendant Alameda County, which includes Alameda County Behavioral Health Care Services, is a public entity subject to Title II, 42 U.S.C. § 12131(1).  Defendant Alameda Health System, which was created by and is an instrumentality of Alameda County, is also a public entity subject to Title II.  *Id*.

155.    Defendants violate the ADA, and its implementing regulations, including as follows:

a. By administering the County's mental health system in a way that subjects DRC Constituents to unnecessary institutionalization at a psychiatric hospital or other institution, instead of providing them with services in the community. 42 U.S.C. § 12132.

b. By failing to administer services, programs, and activities in "the most integrated setting" appropriate to the needs of DRC Constituents. 28 C.F.R. § 35.130(d).

c. By using criteria or methods of administration in Alameda County's mental health system that subject DRC Constituents to discrimination on the basis of their disabilities. 28 C.F.R. § 35.130(b)(3).

d. By failing to make reasonable modifications to allow DRC Constituents to participate in Defendants' services, programs, and activities in an integrated community setting.

156. Providing DRC Constituents with the community services they need to avoid unnecessary institutionalization and segregation at a psychiatric hospital or other institution would not fundamentally alter Defendants' programs, services, or activities.

157. Plaintiff and DRC Constituents have suffered and will suffer injury as a proximate result of Defendants' violation of their rights under the ADA.

158. Plaintiff is entitled to declaratory relief, injunctive relief, attorneys' fees, and costs.

**SECOND CLAIM FOR RELIEF**
**Violation of Section 504 of the Rehabilitation Act**
**Failure to Provide Services in the Most Integrated Setting Appropriate**
**29 U.S.C. § 794; 28 C.F.R. § 41.51; 45 C.F.R. § 84.4**

159. Plaintiff repeats and incorporates by reference the preceding paragraphs of this Complaint as if set forth in full herein.

160. DRC Constituents are qualified individuals with disabilities within the meaning of Section 504 of the Rehabilitation Act. 29 U.S.C. § 794(a).

161. Defendants are engaged in providing programs or activities receiving Federal financial assistance sufficient to invoke the coverage of Section 504. *Id.* § 794(b)(1) & (b)(3).

36

785552.7

162. Defendants violate Section 504, and its implementing regulations, including as follows:

      a. By failing to administer services, programs, and activities in "the most integrated setting" appropriate to the needs of the DRC Constituents. 28 C.F.R. § 41.51(d); 45 C.F.R. § 84.4(b)(2).

      b. By directly or through contractual or other arrangements using methods of administering Alameda County's mental health system that subject DRC Constituents to discrimination on the basis of their disabilities. 28 C.F.R. § 41.51(b)(3); 45 C.F.R. § 84.4(b)(4)

163. Providing DRC Constituents with the community services they need to avoid unnecessary institutionalization and segregation at a psychiatric hospital or other institution would not fundamentally alter Defendants' programs, services, or activities.

164. Plaintiff and DRC Constituents have suffered and will suffer injury as a proximate result of Defendants' violation of their rights under Section 504 of the Rehabilitation Act.

165. Plaintiff is entitled to declaratory relief, injunctive relief, attorneys' fees, and costs.

### THIRD CLAIM FOR RELIEF
**Violation of California Government Code §§ 11135 and 11139**

166. Plaintiff repeats and incorporates by reference the preceding paragraphs of this Complaint as if set forth in full herein.

167. California Government Code sections 11135 and 11139 prohibit discrimination against persons on the basis of physical or mental disability and other protected statuses in state-run or state-funded programs and activities.

168. Defendants Alameda County, ACBHCS, and AHS are recipients of financial assistance from the state of California under Government Code section 11135(a).

169. Defendants Alameda County and ACBHCS transfer part of their State support to AHS as part of their contractual arrangement.

170.   California Government Code § 11135(b) incorporates the protections and prohibitions contained in the ADA and its implementing regulations.  Section 11135(b) states in pertinent part, that:

> With respect to discrimination on the basis of disability, programs and activities subject to subdivision (a) shall meet the protections and prohibitions contained in Section 202 of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12132), and the federal rules and regulations adopted in implementation thereof, except that if the laws of this state prescribe stronger protections and prohibitions, the programs and activities subject to subdivision (a) shall be subject to stronger protections and prohibitions.

171.   Accordingly, Defendants' failure to provide DRC Constituents with services in the most integrated setting appropriate as alleged above, which violates the ADA, also violates Section 11135.

172.   In addition, Defendants' policies and methods of administering Alameda County's mental health system—directly or through contractual or other arrangements, including through the County and ACBHCS' contract with AHS—subjects DRC Constituents to unnecessary institutionalization and segregation at psychiatric hospitals and other institutions, instead of providing them with services in the community.  The County and ACBHCS are therefore in violation of the regulations implementing Section 11135 by causing, aiding, or perpetuating discrimination against DRC Constituents on the basis of mental disability through the contractual arrangement with AHS.  2 Cal. Code Regs. § 11154(e).

173.   For all the reasons outlined above, Defendants have violated and continue to violate California Government Code § 11135 and 11139 through their non-compliance with the statute and its implementing regulations.  *See* 2 C.C.R. § 11154(i).

174.   Plaintiff is entitled to declaratory relief, injunctive relief, attorneys' fees, and costs.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

1.   Issue a declaratory judgment that Defendants are violating the ADA, Section 504 of the Rehabilitation Act, and California Government Code section 11135 by, *inter alia*:

785552.7

a.     failing to provide DRC Constituents with services in the most integrated setting and needlessly institutionalizing them in a psychiatric hospital or other institution or putting them at serious risk of such institutionalization;

b.     discriminating against DRC Constituents on the basis of disability by utilizing methods of administration, adopting and applying policies, failing to make reasonable modifications to programs and policies, and engaging in practices that result in unnecessary segregation and institutionalization or subjecting them to risk of institutionalization;

2.     Enjoin Defendants, their successors in office, subordinates, agents, employees and assigns, and all persons acting in concert with them from subjecting DRC Constituents to the unlawful acts and omissions described herein, and issue an injunction sufficient to remedy these violations;

3.     Order Defendants to take immediate action to reform their policies, procedures and practices to fully comply with the ADA, Section 504, and California Government Code section 11135.  Under such order, Defendants must:

a.     Cease the unnecessary institutionalization of DRC Constituents;

b.     Provide intensive community-based mental health services to prevent unnecessary institutionalization;

c.     Ensure that these intensive community services are provided in a manner that is culturally congruent and responsive which, among other things, will address the racial disparities impacting Black DRC Constituents described herein.

4.     Retain jurisdiction of this case until Defendants have fully complied with the orders of this Court and there is reasonable assurance that Defendants will continue to comply in the future absent the Court's continuing jurisdiction;

5.     Award Plaintiff reasonable attorneys' fees, costs, expenses, and disbursements as authorized by law; and

1    6.    Grant further relief as the Court may deem just and proper.

2

Dated: July 30, 2020                    Respectfully submitted,

3
                                        DISABILITY RIGHTS CALIFORNIA
4

5
                                        */s/ Kimberly Swain*
6                                       Kimberly Swain

7

8                                       GOLDSTEIN, BORGEN, DARDARIAN & HO

9
                                        */s/ Andrew P. Lee*
10                                      Andrew P. Lee

11

12                                      BAZELON CENTER FOR MENTAL HEALTH
                                        LAW
13

14                                      */s/ Ira A. Burnim*
                                        Ira A. Burnim
15

16                                      DISABILITY RIGHTS EDUCATION AND
                                        DEFENSE FUND
17

18
                                        */s/ Claudia Center*
19                                      Claudia Center

20                                      *Attorneys for Plaintiff*

21                             **SIGNATURE ATTESTATION**

22        In accordance with Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this

23   document has been obtained from the signatories on this e-filed document.

24   Dated:  July 30, 2020                    */s/ Andrew P. Lee*
25                                            Andrew P. Lee

26

27

28

                                        40

785552.7

# Appendix A



**LEGAL ADVOCACY UNIT**
1330 Broadway, Ste. 500
Oakland, CA 94612
Tel: (510) 267-1200
TTY: (800) 719-5798
Intake Line: (800) 776-5746
Fax: (510) 267-1201
www.disabilityrightsca.org

November 1, 2019                              *Via Email*

Karyn L. Tribble, Director                Donna Ziegler
Alameda County Behavioral Health    Alameda County Counsel
Care Services                             1221 Oak Street, Suite 450
2000 Embarcadero Cove, Suite 400   Oakland, CA 94612
Oakland, CA 94606                       Donna.Ziegler@acgov.org
Karyn.Tribble@acgov.org

**Re:   DRC Abuse/Neglect Investigation and Request for Information
       Alameda County's Mental Health System**

Dear Dr. Tribble and Ms. Ziegler,

Disability Rights California ("DRC") has been investigating Alameda County's ("the County") mental health system pursuant to its authority as California's protection and advocacy system for people with disabilities.  In the last few months, DRC has visited numerous mental health facilities, including John George Psychiatric Hospital ("John George"), Villa Fairmont Mental Health Rehabilitation Center ("Villa Fairmont"), Jay Mahler Recovery Center, Woodroe Place, Casa de la Vida, Bonita House, and Cronin House, among others.  DRC also visited additional facilities that detain, house, or serve a high number of Alameda County residents with mental health disabilities, including Santa Rita Jail, the Henry Robinson Center, and the South County Homeless Project.[1]  This letter summarizes our initial findings.

---

[1] DRC has designated Goldstein Borgen Dardarian & Ho, the Bazelon Center for Mental Health Law, and Disability Rights Education and Defense Fund as its authorized agents for purposes of its investigation. 42 C.F.R. § 51.42(a).

DRC Investigation, Alameda County Mental Health System
November 1, 2019
Page 2 of 14

Based on our investigation, including facility visits and interviews with patients and providers, we have concluded that there is probable cause to find that abuse and/or neglect of people with disabilities has or may have occurred, as those terms are defined in our authorizing statutes and regulations.  Accordingly, consistent with DRC's statutory access authority, we are requesting the production of additional information and documents, as identified in **Attachment A** at the end of this letter.[2]

As our investigation continues, we propose meeting with you – along with other important stakeholders, including Alameda Health System – to discuss our findings of systemic deficiencies that amount to violations of federal and state law and that put people with mental health disabilities at serious risk of harm.  It is our intention to ensure effective, durable remedial measures to address these issues with you in an efficient and cooperative manner.  ***Please let us know if and when you are available for such a meeting.***

## I.  Definition of Probable Cause

Disability Rights California is the protection and advocacy system for the State of California, with authority to investigate facilities and programs providing services to people with disabilities under the Developmental Disabilities Assistance and Bill of Rights ("PADD") Act,[3] the Protection and Advocacy for Individuals with Mental Illness ("PAIMI") Act,[4] and the Protection and Advocacy for Individual Rights ("PAIR") Act.[5]  The patients and clients we interviewed fall under the federal protections of the PADD Act and/or the PAIMI Act, and their implementing regulations.

Under the PAIMI Act, probable cause means "reasonable grounds for belief that an individual with mental illness has been, or may be at significant risk of being subject to abuse or neglect."  DRC may make a probable cause determination based "on reasonable inferences drawn from [its] experience or training regarding similar incidents, conditions or problems that are usually associated with abuse or neglect."[6]

---

[2] Welf. & Inst. Code § 4903.

[3] 42 U.S.C. § 15041, *et seq.*, as amended, 45 C.F.R. § 1386.

[4] 42 U.S.C. § 10801, *et seq.*, as amended, 42 C.F.R. § 51.

[5] 29 U.S.C. § 794e; Welf. & Inst. Code § 4900, *et seq.*

[6] 42 C.F.R. § 51.2.

DRC Investigation, Alameda County Mental Health System
November 1, 2019
Page 3 of 14

"Abuse" is defined as "any act or failure to act by an employee of a facility rendering care or treatment which was performed, or which was failed to be performed, knowingly, recklessly, or intentionally, and which caused, or may have caused, injury or death to an individual with mental illness."[7]  It also includes "any other practice which is likely to cause immediate harm if such practices continue."[8]  Additionally, "the P&A may determine[] in its discretion that a violation of an individual's legal rights amounts to abuse."[9]

"Neglect" is defined as any "negligent act or omission by an individual responsible for providing services in a facility rendering care or treatment which caused or may have caused injury or death to an individual with mental illness or which placed an individual with mental illness at risk of injury or death."  Neglect may include a failure to "establish or carry out an appropriate individual program or treatment plan (including a discharge plan)," "provide adequate nutrition, clothing, or health care"; or "provide a safe environment" with adequate numbers of appropriately trained staff.[10]

## II. Key Initial Findings

We have found probable cause that abuse and/or neglect of people with disabilities has or may have occurred based on the County's failure to provide people with mental health disabilities:  (1) appropriate services and supports in the most integrated setting appropriate, consistent with the goals of treatment and recovery; and (2) adequate treatment, conditions, and discharge planning at the County's institutions (psychiatric hospital, IMDs, and jail).

Alameda Health System plays a notable role in this discussion, with respect to the conditions people with disabilities face at John George as well as the deficiencies in treatment and discharge planning.

Similarly, Alameda County's jail system, which consistently incarcerates a disproportionately high population of people with mental health disabilities, plays a consequential role in the issues we have

---

[7] 42 C.F.R. § 51.2.
[8] 45 C.F.R. § 1326.19.
[9] *Id*.
[10] 42 C.F.R. § 51.2.

DRC Investigation, Alameda County Mental Health System
November 1, 2019
Page 4 of 14

identified.  We are aware that people with mental health disabilities held in jail face dangerous and damaging isolation conditions and inadequate access to programming or meaningful mental health treatment (including discharge planning), deficiencies that are the subject of current federal litigation.  *Babu v. County of Alameda*, Case No. 4:18-cv-07677 (N.D. Cal). We have learned that people with mental health disabilities regularly cycle in and out of both the County's psychiatric institutions and the jail system.

### A.    Failure to Provide Appropriate Services in the Most Integrated Setting

People with mental health disabilities have a right to access treatment and services in the most integrated setting appropriate.[11]  Needless segregation in institutions perpetuates unfounded assumptions that people with disabilities are incapable or unworthy of participating in society.  In addition, it deprives them of benefits and opportunities of community life.[12]

Recent data shows that Alameda County involuntarily commits the highest number of adults with serious mental illness of any county in California.  Its involuntary detention rate is more than three-and-a-half times the statewide average.[13]

We found that people with serious mental illness in Alameda County experience, or are at risk of experiencing, unnecessary institutionalization on a broad and systemic scale, in ways that are harmful and injurious to their health and well-being, thus constituting a ground for a finding of probable cause of abuse and/or neglect.

---

[11] Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131-12134, Section 504 of the Rehabilitation Act ("the Rehabilitation Act"), 29 U.S.C. §§ 794 *et seq.*, 28 C.F.R. § 41.51(d); 28 C.F.R. § 35.130(d) (1991); and Gov't Code §§ 11135-11139.

[12] *Olmstead v. L.C.*, 527 U.S. 581, 600-01 (1999).

[13] *See* California Involuntary Detentions Data Report, FY 2016/2017, http://www.dhcs.ca.gov/services/MH/Documents/FY16-17_InvolunDetenRep_12pt.pdf  (Alameda County's 72-hour involuntary detention rate is 162.5 per 10,000 people, in contrast to the statewide average of 46.0, and that its 14-day intensive treatment rate is 46.6 per 10,000 people, in contrast to the statewide average of 13.1).

DRC Investigation, Alameda County Mental Health System
November 1, 2019
Page 5 of 14

### 1. Harmful and Needless Institutionalization in John George's Psychiatric Emergency Services Unit

John George's Psychiatric Emergency Services (PES) unit is the primary facility providing services for adult Alameda County residents in psychiatric crisis.  The PES is experiencing record high numbers of crisis visits—more than 1,100 visits per month.  The number of people experiencing a psychiatric crisis regularly exceeds John George's capacity to treat such patients safely.

During our recent monitoring visits, we observed that individuals at John George's PES unit regularly wait 24 hours or more to receive an evaluation or any treatment.  Our analysis of available data found that scores of people have been held for 70 hours or longer in 2019 alone, including at least one person who remained in the PES unit for eight days.

We observed individuals crowded into a single room awaiting evaluation and treatment.  While waiting, patients compete for places to sit and lie down—including on the floor and in the hallways.  On our recent tour, the census in the PES had reached 60 patients, far above the number of people it is designed and equipped to serve (resulting in a "census hold," discussed below).

Subjecting Alameda County residents to these counter-therapeutic conditions is particularly disconcerting given the County's own estimate that more than 75% of those placed on involuntary psychiatric holds—almost 10,000 people per year—do "not meet medical necessity criteria for inpatient acute psychiatric services."[14]

John George periodically institutes "census holds," which means that, in the troubling yet common situation where demand outpaces the facility's resources, John George must cut off admissions of patients from local emergency departments and inpatient units, regardless of their need for acute psychiatric evaluation and treatment.

---

[14] *See, e.g.*, Alameda County Project Summary, Community Assessment and Transport Team (Apr. 13, 2018), https://mhsoac.ca.gov/sites/default/files/documents/2018-10/Alameda_INN%20Project%20Plan_Community%20Assessment%20and%20Transport%20Team_8.6.2018_Final.pdf.

DRC Investigation, Alameda County Mental Health System
November 1, 2019
Page 6 of 14

Given these circumstances, people with serious mental illness face enormous risks, both of being confined unnecessarily in counter-therapeutic institutions and of being denied needed acute care.

These problems are compounded by systemic deficiencies that drive cycling in and out of John George for many people.  The County itself has recognized that, upon discharge from PES, the majority of patients are "not linked to planned services and continue to over-use emergency services."[15] For example, we spoke with a patient who spent well over 24 hours in the PES and had multiple previous PES admissions.  He reported that he is generally provided with little or no support at discharge (other than a non-individualized list of resources), and we confirmed that he would soon be discharged again without adequate discharge planning.

### 2.  Harmful and Needless Institutionalization in John George's Inpatient Units

We learned through the course of our monitoring that the average daily census and average length of stay in John George's inpatient units is on the rise in recent years.  The inpatient units are on pace to have over 5,000 patient visits in 2019.  These units are segregated, institutional settings that allow little autonomy and are defined by rigid rules and monitoring.

All too often, patients are subjected to extended stays beyond what is clinically necessary due to a lack of sufficient community mental health resources, housing support, and/or programs that can meet patients' needs.  These extended "administrative" stays can last several days or more, costing millions of dollars and harming patients through unnecessary institutionalization.

### 3.  Harmful and Needless Institutionalization in Institutes for Mental Diseases

ACBHCS contracts with the Telecare Corporation to operate three mental health facilities that collectively hold almost 200 people with mental illness on a given day: (1) Villa Fairmont Mental Health Rehabilitation

---

[15]  Alameda County Project Summary, Community Assessment and Transport Team (Apr. 13, 2018), https://mhsoac.ca.gov/sites/default/files/documents/2018-10/Alameda_INN%20Project%20Plan_Community%20Assessment%20and%20Transport%20Team_8.6.2018_Final.pdf.

DRC Investigation, Alameda County Mental Health System
November 1, 2019
Page 7 of 14

Center, (2) Gladman Mental Health Rehabilitation Center, and (3) Morton Bakar Center.  These facilities are large, congregate, institutional settings populated by individuals with mental health disabilities.  Individuals confined to these psychiatric institutions, especially Villa Fairmont, regularly remain institutionalized for weeks beyond what is clinically necessary due to the shortage of appropriate community options.

For example, we understand that, at Villa Fairmont, people are often held longer than clinically indicated due to the lack of appropriate residential and supportive services in the community.  One patient at Villa Fairmont who was clinically ready for discharge faced an extremely lengthy delay in discharging from the institution due to the lack of a program to support his diabetes care needs.  We also learned of incidents where people identified as appropriate for the community-based Casa de la Vida program waited weeks in Villa Fairmont, and even in Santa Rita Jail, for a spot to become available.

### 4. Lack of Community-Based Mental Health Services and Permanent Supported Housing

DRC found that, even with the recent implementation of some community programs (including the new crisis intervention services[16]), the need for community-based mental health treatment in Alameda County greatly outpaces the County's current capacity to provide such services. Indeed, providers at virtually every facility we visited spoke about how the lack of sufficient community-based mental health services and inadequate housing options create significant barriers to providing Alameda County residents with long-term safe environments and opportunities for recovery.

While the lack of community-based mental health services is extensive, a few key deficiencies raised repeatedly by mental health providers and Alameda County residents include not only the limited crisis intervention services but also: (1) failure to link high needs individuals to

---

[16] We are encouraged to see the recent implementation of programs designed to address the historical service deficit in the area of crisis intervention, including this year's rollout of the Community Assessment and Transport Team (CATT) program and the recent opening of Amber House's crisis stabilization unit and crisis residential treatment program. These programs are essential, and will almost certainly require significant expansion in order to meet the needs of the County's mental health services consumer population.

DRC Investigation, Alameda County Mental Health System
November 1, 2019
Page 8 of 14

Full Service Partnerships; (2) lack of housing, especially permanent
supported housing; and (3) lack of integrated services.

We learned of people with mental health disabilities discharging from
residential treatment programs to inadequate housing or homelessness,
and without essential services and support to avoid further incident of
psychiatric decompensation and institutionalization.  We discovered
waitlists for housing and other services of six months or more.

The scarcity of community-based mental health resources in
Alameda County is especially acute for individuals who have both mental
health and other co-occurring needs.  For instance, there is insufficient
service capacity for people with a dual diagnosis of mental illness and
substance use.  The primary provider of this service, Bonita House, has
capacity to serve just fifteen people.  Patients must be ambulatory.  This
means that individuals who have dual-diagnoses and need such services
are often left without timely access to such services.

Likewise, patients with co-occurring disabilities and health conditions
experience a shortage of treatment and housing options, as noted above.

These systemic deficiencies are dangerous and damaging in
multiple ways: <u>first</u>, they prolong unnecessary institutionalization in
restrictive facilities; and <u>second</u>, they place at serious risk patients who
have mental health disabilities combined with other disability and/or
treatment needs that are not adequately addressed.  Indeed, a high
number of chronically homeless individuals report living with multiple
disabling conditions, including not just psychiatric disorders but also
intellectual and developmental disabilities, chronic health problems,
physical disabilities, and/or substance abuse disorders.  The situation also
serves to stigmatize members of the population that ACBHS serves who
are already marginalized and at elevated risk.

*      *      *

Alameda County's harmful and needless institutionalization of large
numbers of its residents with serious mental illness puts people at serious
risk of harm, at times with life-threatening consequences.  The County's
failure to provide services in the most integrated setting possible—through
community services and supports—also violates Alameda County
residents' federal and state rights.  The ADA, the Rehabilitation Act, and
the federal Medicaid Act, as well as related state law, prohibit

DRC Investigation, Alameda County Mental Health System
November 1, 2019
Page 9 of 14

discrimination against persons with disabilities, which includes unnecessary segregation in institutions like psychiatric hospitals and other locked facilities.

### B.     Inadequate Discharge and Other Treatment Plans

Alameda County's system of discharge planning for people returning to the community from institutions is inadequate; the County maintains no effective practice for ensuring that individuals are discharged to appropriate settings with adequate services and supports to prevent re-institutionalization.  This deficiency constitutes "neglect" under the law, which is defined, *inter alia*, as a failure to "establish or carry out an appropriate individual program or treatment plan (*including a discharge plan*)."[17]

During our monitoring visits, we observed significant deficiencies related to discharge planning, and a lack of adequate coordination between facilities and community-based service providers.  We learned that many individuals are discharged to dangerous situations without adequate linkages to essential mental health care and related supports.  The discharge plans for people with mental health disabilities at John George, IMDs, and Santa Rita Jail are frequently boilerplate and disconnected from a person's individualized needs as they prepare to return to the community.

Due to inadequate treatment and discharge plans, Alameda County residents with mental health disabilities end up experiencing repeated placements at John George or other locked psychiatric facilities.  We are aware of many patients with mental health disabilities who have been repeatedly admitted to John George.  Public documents show that approximately 2,300 John George PES visits each year consist of "high utilizers" of care (defined by AHS as people with at least four PES visits in a twelve-month period).[18]  Data recently provided by AHS also reveals that more than 250 people have had four or more John George inpatient admissions since 2016.  Nearly half of this group identifies as Black or

---

[17] 42 C.F.R. § 51.2 (emphasis added); *see also* Welf. & Inst. Code § 4900(g)(3).
[18] Rebecca Gebhart & Karyn Tribble, John George Pavilion, Capacity Issues: Causes and Potential Solutions at 6 (July 11, 2016), http://www.acgov.org/board/bos_calendar/documents/DocsAgendaReg_7_11_16/HEALTH%20CARE%20SERVICES/Regular%20Calendar/John_George_Pavilion_Psych_services_Health_7_11_16.pdf.

DRC Investigation, Alameda County Mental Health System
November 1, 2019
Page 10 of 14

African-American, a striking and disproportionately high number.  One person estimated that he had been held at John George more than 150 times.

We are also concerned about these same individuals cycling unnecessarily between locked psychiatric facilities, jail, and homelessness. It is notable and disturbing that an estimated 25% of the County's jail population and one-third of the County's homeless population has serious mental illness.

Alameda County also lacks an adequate system for assessing, placing, and tracking its mental health patients, which compounds the problems that DRC observed related to discharge planning.  The system is comprised of various different providers and lacks an effective method for tracking each patient's evaluations, referrals, treatment, and progress.

Deficiencies in the County's coordination between the County's jail system and Alameda County Behavioral Health Care Services plays a role here as well.  We observed deficiencies in the provision of discharge/reentry planning and services for people with mental health disabilities being released from Santa Rita Jail.  These deficiencies expose this group to significant risks of re-institutionalization, homelessness, and a range of physical and psychological harms.

As one federal court recently noted, the recurring cycle of institutionalization, without adequate community-based services to stop it, is "the hallmark of a failed system."[19]

## III. Next Steps

Given these initial findings, we plan to proceed with our investigation, including reviewing additional relevant documents and information.

Because DRC has found probable cause to believe that abuse and/or neglect has occurred, we are entitled to access and examine all relevant

---

[19] *United States of America v. State of Mississippi*, --- F.Supp.3d ----, 2019 WL 4179997, *7, No. 3:16-CV-622-CWR-FKB (S.D. Miss. Sept. 3, 2019).

DRC Investigation, Alameda County Mental Health System
November 1, 2019
Page 11 of 14

records.[20]  We are also entitled to lists of names of individuals receiving services from the County's mental health system.[21]

While DRC has broad discretion and independence in determining how to best gain access to individuals, facilities, and records, we have a statutory duty to maintain the confidentiality of any records obtained in the course of an investigation.[22]  The access authority and confidentiality requirements that apply to DRC apply equally to its authorized agents.

DRC's statutory access authority directs that it shall have access to such records "relevant to conducting an investigation . . . not later than three business days after the agency makes a written request."[23]

*We request that the County provide the records and information requested in Attachment A no later than November 22, 2019.*

## IV.   Conclusion

If you have any questions regarding our initial findings or our request for documents and information, please feel free to contact us.

---

[20] 42 C.F.R. § 51.41(d); Welf. & Inst. Code § 4902(a)(1); Welf. & Inst. Code § 4903(a).

[21] DRC's access comes with Congress' intent that protection and advocacy systems have extensive investigative authority to "ensure that PAIMI's mandates can be effectively pursued." *Ala. Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr.*, 97 F.3d 492, 497 (11th Cir.1996).  Courts have found this to mean that following the requisite probable cause finding that neglect and abuse occurs within a facility charged with caring for individuals with a mental illness, authorized agencies, like DRC, may access a list names of individuals at the facility or involved in a specific program at the facility.  *Connecticut Office of Prot. & Advocacy for Persons With Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 244-45 (2d Cir. 2006); *Penn. Prot. & Advocacy, Inc. v. Royer-Greaves Sch. for the Blind,* 1999 WL 179797 (E.D. Pa 1999).

[22] 42 U.S.C. §§ 10805, 10806; *see also* Welf. & Inst. Code § 4903(f).

[23] Welf. & Inst. Code § 4903(e)(1).

DRC Investigation, Alameda County Mental Health System
November 1, 2019
Page 12 of 14

We also look forward to having the opportunity to sit down and speak with you about next steps toward achieving an effective, durable remedy to the issues we have identified.  Please let us know when you are available for such a meeting.

Thank you for your ongoing cooperation and courtesy.


Sincerely,

*/s/ Kim Swain*

Kim Swain
Disability Rights California


*/s/ Andrew P. Lee*

Andrew P. Lee
Goldstein Borgen Dardarian & Ho


*/s/ Jennifer Mathis*

Jennifer Mathis
Bazelon Center for Mental Health Law


*/s/ Namita Gupta*

Namita Gupta
Disability Rights Education & Defense Fund

Cc:  David Abella, Alameda Health System [dabella@alamedahealthsystem.org]

Encl: Attachment A-DRC Requests for Records and Information

DRC Investigation, Alameda County Mental Health System
November 1, 2019
Page 13 of 14

## Attachment A

## DRC REQUESTS FOR RECORDS AND INFORMATION

Pursuant to its access authority, DRC requests the documents and information described below *no later than November 22, 2019.*

DRC reserves the right to follow up with additional document and information requests.

A. List of all individuals, including their respective current commitment status, length of stay, and contact information, currently (*i.e.*, as of date of response) receiving treatment at: (1) John George Psychiatric Hospital, (2) Villa Fairmont, (3) Gladman, and (4) Morton Bakar.

B. List of all individuals, including contact information, who visited John George's PES unit more than three times since January 1, 2018, including documentation of how many times they visited John George's PES and/or inpatient unit, the dates and lengths of stay for each visit, the setting to which each person was discharged, and any discharge plans provided.

C. List of all individuals, including contact information, who were admitted to John George's inpatient unit two or more times since January 1, 2018, including documentation of how many times they visited John George's inpatient unit, the dates and lengths of stay for each visit, the setting to which each person was discharged, and any discharge plans provided.

D. List of all individuals, including contact information, who stayed at Villa Fairmont, Morton Bakar, and/or Gladman two or more times since January 1, 2018, including documentation of how many times they visited these facilities, the dates and lengths of stay for each visit, the setting to which each person was discharged, and any discharge plans provided.

E. List of all individuals, including contact information, who have within the past two years received treatment at: (1) John George Psychiatric Hospital, (2) Villa Fairmont, (3) Gladman, or (4) Morton Bakar, AND had a co-occurring disorder or chronic condition, such as a substance abuse disorder, a physical disability, or a chronic condition, with the dates and lengths of stay for each visit, the setting to which each person was discharged, and any discharge plans provided.

DRC Investigation, Alameda County Mental Health System
November 1, 2019
Page 14 of 14

F. List of all individuals, including contact information, who have a serious mental illness and have been discharged to a homeless shelter following a visit/admission at John George.

G. List of all individuals, including contact information, who have used crisis or emergency services for psychiatric reasons two or more times within the past two years.

H. List of all individuals, including contact information, who were booked at Santa Rita Jail within 60 days or less of discharge from John George's inpatient or PES units, Villa Fairmont, Gladman, or Morton Bakar since January 1, 2018.

I. List of all individuals, including contact information, who were admitted to John George's inpatient or PES units within 60 days or less of release from Santa Rita Jail since January 1, 2018.

J. The MHS-140 Client Information Face Sheet(s) for each person on any of lists produced in response to any of the aforementioned Requests.

K. The County's definition of a "high utilizer" of mental health services, and any policies or procedures that correspond with special treatment or care provided to such high utilizers.

L. Any and all policies and training materials regarding referrals to Full Service Partnerships.

M. The criteria that ACCESS uses to determine eligibility for a Full Service Partnership.

N. Any and all policies and training materials regarding discharge plans from John George's PES, John George's inpatient units, Villa Fairmont, Gladman, Morton Bakar, and Santa Rita Jail.