1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DISABILITY RIGHTS CALIFORNIA,

Plaintiff,

v.

COUNTY OF ALAMEDA, et al.,

Defendants.

Case No.  20-cv-05256-CRB

**ORDER GRANTING MOTIONS TO DISMISS AND DENYING MOTION TO STRIKE**

Disability Rights California (DRC) is suing the County of Alameda (the County), Alameda County Behavioral Health Care Services (ACBHCS), and Alameda Health System (AHS) for alleged violations of the Americans with Disabilities Act, the Rehabilitation Act, and California disability law.  DRC alleges that Defendants subject Alameda residents to unnecessary institutionalization and an unnecessary risk of institutionalization by failing to provide sufficient community-based treatment programs and other services that would reduce institutionalization in the County.

AHS has moved to dismiss DRC's claims for lack of standing and for failure to state a claim for which relief may be granted.  Separately, the County and ACBHCS (collectively, the County Defendants) have moved to dismiss DRC's claims for lack of standing and for failure to state a claim for which relief may be granted.

Although the Court concludes that DRC has standing, the Court grants Defendants' motions to dismiss with leave to amend because DRC has not stated a claim against AHS, the County, or ACBHCS for which relief may be granted.  The Court determines that there is no need for oral argument.

United States District Court
Northern District of California

## I.    BACKGROUND

The Protection and Advocacy for Individuals with Mental Illness Act (PAIMI)'s express statutory purpose is, in part, "to assist States to establish and operate a protection and advocacy system for individuals with mental illness."  42 U.S.C. § 10801(b)(2).  A Protection & Advocacy system established under PAIMI has authority to "pursue administrative, legal, and other remedies" on behalf of state residents with mental illnesses.  Id. § 10805(a)(1)(C).  California has designated DRC to serve as California's Protection & Advocacy system for people in California with disabilities.  Id. ¶ 19.  DRC refers to California residents for whom it advocates as "Constituents."  Id. ¶ 23.

On July 30, 2020, DRC brought this action against the County, ACBHCS, and AHS.  Complaint (dkt. 1) ¶ 1.  ACBHCS is a County entity that implements the County's mental health system and provides mental health services to County residents.  Id. ¶¶ 51, 66.  AHS owns and operates John George Psychiatric Hospital (John George), where it provides inpatient care under a contract with ACBHCS, but not Villa Fairmont Mental Health Rehabilitation Center (Villa Fairmont), another County psychiatric institution located on the same "campus" as John George.  Id. ¶¶ 3, 6, 52, 66, 107.

### A.    General Allegations

DRC opened an investigation into the County's institutionalization practices in 2018.  Id. ¶ 69.  The investigation involved touring mental health facilities, Santa Rita Jail, and various homeless shelters and interviewing their residents.  Id.  On November 1, 2019, DRC "found probable cause to believe" that the County had abused and neglected DRC Constituents based on Defendants' failure to provide "needed services and support in the most integrated setting appropriate."  Id. ¶ 70.  Here, the relevant DRC Constituents are "adult Alameda County residents" who "have a serious mental health disability" and whom DRC alleges "are unnecessarily segregated in the County's psychiatric institutions or are at serious risk of being needlessly segregated into these institutions."  Id. ¶¶ 23–24.  DRC has listed several individual Constituents as exemplars.  Id. ¶ 28.

In general, DRC alleges that "Defendants have not provided sufficient intensive

community-based mental health services to DRC Constituents, and are causing them, particularly black DRC Constituents, to be unnecessarily segregated in costly, publicly funded institutions, often repeatedly." Id. ¶ 71.  DRC alleges that Defendants' practices violate federal and state laws prohibiting unnecessary institutionalization, and that Defendants can reasonably accommodate providing expanded "community-based" or "integrated" services.  Id. ¶¶ 54–63.[1]

Based on these general allegations, DRC seeks a declaratory judgment that Defendants are violating the Americans with Disabilities Act (ADA), the Rehabilitation Act, and California Government Code sections 11135 and 11139.  Id. at 38–39.  DRC also seeks an injunction requiring Defendants to comply with these laws.  Id. at 39.

### B.    Specific Allegations

#### 1.    Unnecessary Institutionalization

DRC alleges that Defendants "unnecessarily segregate DRC Constituents into psychiatric institutions." Id. at 17.  Under California law, if County staff state that they have reason to believe that a person is gravely disabled or a danger to themselves or others due to a mental health disability, the County can detain the person for 72 hours.  Id. ¶ 72 (citing Cal. Welf. & Inst. Code § 5150(a)).  DRC alleges that the County detains more individuals than any other county in California, at more than triple the statewide rate.  Id. ¶ 73.  As DRC puts it, "[b]ecause Defendants' community-based services are insufficiently available, the County detains vast numbers of DRC Constituents in crisis at John George, the designated public hospital authority . . . .  The psychiatric hospital is large, crowded, and physically isolated from community life." Id. ¶¶ 74–75.

Part of the alleged unnecessary institutionalization takes place in John George's

---

[1] DRC alleges that "Defendants' practices place DRC constituents at especially grave risk from the COVID-19 pandemic" because, although they have initiated social distancing protocols, "there remains a significant risk of Covid-19 infection spreading through" Defendants' facilities.  Complaint ¶¶ 141, 143.  "Given the grave risk of infection for DRC Constituents who cycle between jail, John George, Villa Fairmont, and homelessness, DRC constituents need intensive community-based mental health services now more than ever." Id. ¶ 146.

United States District Court
Northern District of California

Psychiatric Emergency Services (PES) unit.  Plaintiffs allege that the County detains "nearly 1,000 people at John George's PES unit every month," that 36% of those detained are black, that black men are 30% more likely to be detained after a mental health crisis call, and that "[a]ccording to the County's own estimates, more than 75% of those detained in PES do not meet medical necessity criteria for inpatient psychiatric services."  Id. ¶¶ 77–79.  At PES, detainees are locked in a 35x45 foot "filthy" room, "where they must compete for places to sit, lie, or stand."  Id. at ¶ 80.  These conditions "often exacerbate rather than alleviate people's mental health symptoms."  Id.  "Many DRC Constituents spend fewer than twenty-four hours at the PES" before being released or transferred to one of John George's inpatient units or another facility, "but a significant number remain for multiple days," and some stay "for more than a week."  Id. ¶ 81.  Because most are released "without adequate intensive community-based services in place," repeated "re-institutionalization" is common.  Id. ¶ 82.

Additional alleged unnecessary institutionalization takes place in John George's inpatient units.  Id. at 19.  About 25% of people brought to PEC are admitted to these units, which are "highly institutional settings" with "locked wards" that are "monitored continuously" and subject to "rigid rules."  Id. ¶ 83.  DRC alleges that Defendants "needlessly extend" institutionalization in these inpatient units without medical justification "due to the lack of available community-based services," which also contributes to "re-institutionalization."  Id. ¶ 85.

Other alleged unnecessary institutionalization takes place in Villa Fairmont's sub-acute units.  Id. at 19.  Many people are discharged from John George's inpatient units into Villa Fairmont's "locked" facility that is "similar in many ways to John George."  Id. ¶¶ 86–87.  DRC alleges that "due to a lack of intensive community services, the County Defendants often keep people at Villa Fairmont "beyond the time the staff deems appropriate."  Id. ¶ 88.

### 2.    Risk of Unnecessary Institutionalization

DRC also alleges that its Constituents "are at serious risk of repeated cycles of

unnecessary institutionalization." Id. ¶ 89.  DRC alleges that from January 2018 to January 2020, over 350 DRC Constituents were detained in PES over ten times, that 84 of these people were detained 25 times or more, and that six people were detained more than 85 times.  Id. ¶ 90.  A disproportionate number of repeat detainees were black.  Id.  And "[r]epeat admissions to John George's inpatient units and to sub-acute facilities such as Villa Fairmont are also common."  Id. ¶ 91.

DRC alleges that this "high rate of re-institutionalization is directly related to Defendants' failure to provide DRC Constituents with needed intensive community-based services upon discharge from" the relevant facilities.  Id. ¶ 92.  First, DRC alleges that Constituents "without stable housing" are at "serious risk" of unnecessary institutionalization.  Id. at 21.  And DRC alleges that Defendants "frequently discharge" DRC Constituents "to homelessness, which itself "aggravates the effects of mental health disabilities" and increases the "risk of re-institutionalization."  Id. ¶¶ 95, 97–98.  Second, DRC alleges that Constituents who "have been incarcerated" or had "other involvement with the criminal system" are at "serious risk" of unnecessary institutionalization.  Id. at 22.  "Hundreds" of Constituents "discharged from John George end up in jail shortly after their release, and the County "is aware that many DRC Constituents are arrested and detained . . . for behaviors relating to their mental health condition[s]."  Id. ¶¶ 103–104. "If needed intensive community services were available, many of these individuals would be able to avoid incarceration."  Id. ¶ 104.

### 3.    Failure to Provide Specific Community-Based Services

DRC alleges that Defendants do not provide certain community-based services that would reduce unnecessary institutionalization.  Id. at 24.  Although its Constituents "are qualified to receive mental health services in the community, in settings far more integrated" than the relevant facilities, DRC alleges that

> [t]he County and ACBHCS fail to provide DRC Constituents with the community services they need, including Full Service Partnerships and/or comparable intensive services and supported housing.  Some DRC Constituents receive some of the services they need some of the time.

United States District Court
Northern District of California

> However, Defendants deny a vast number of DRC Constituents the intensive community services they need to avoid institutionalization . . . or detention in jail.

Id. ¶ 112 (emphasis in original).

DRC alleges that these failures on the part of the County Defendants are "compounded" by AHS's "failure to develop individualized treatment and discharge plans, to ensure their timely and effective implementation, and to coordinate with the County, ACBHCS, and community-based service providers." Id. ¶ 131. DRC alleges that under its contract with ACBHCS, AHS is responsible for facilitating patients' return to less restrictive treatment in the community, communicating with community service providers to improve treatment and discharge planning, collaborating with ACBHCS on care plans for patients needing special attention, and helping ACBHCS to assess problems and recommend changes related to various services. Id. ¶ 133. DRC alleges that AHS does not "adequately consult" with community providers, ACBHCS case managers, physicians, and other relevant persons regarding the treatment and discharge of patients, and that AHS fails to develop individualized treatment and discharge plans. Id. ¶¶ 134–135.

### 4.    Reasonable Modifications

Finally, DRC alleges that "with reasonable modifications to [the] County's mental health system, Defendants would be able to meet DRC Constituents' services needs and prevent their unnecessary institutionalization." Id. ¶ 148. DRC says such modifications would include:

> Conducting a systemwide assessment of the community-based needs of DRC Constituents with input from the Constituents themselves; ensuring the effective coordination and provision of existing community-based services; expanding the capacity to provide needed intensive community-based services; relocating services from institutions to community-based settings; outreach to and engaging DRC constituents in services; and maximizing federal, state, and local funding, including through Medi-Cal.

Id. DRC alleges that Defendants could accomplish these changes by redirecting spending from segregated and institutional programs to community-based ones. Id. ¶ 149.

United States District Court
Northern District of California

### C.   Claims for Relief

Based on these allegations, DRC asserts three claims for relief.  First, DRC asserts that Defendants have violated Title II of the ADA by failing to provide services in the most integrated setting appropriate.  Id. at 35 (citing 42 U.S.C. §§ 12131 et seq; 28 C.F.R. § 35.130).[2]  Second, DRC asserts that Defendants have violated § 504 of the Rehabilitation Act by failing to provide services in the most integrated setting appropriate.  Id. at 36 (citing 29 U.S.C. § 794; 28 C.F.R. § 41.51; 45 C.F.R. § 84.4).  Third, DRC asserts that Defendants have violated California Government Code sections 11135 and 11139 by discriminating against persons based on physical or mental disability in state-run or state-funded programs and activities.  Id. ¶ 167.

DRC requests that the Court (1) issue a declaratory judgment that defendants are violating these statutes, (2) enjoin Defendants from "subjecting DRC Constituents to the unlawful acts" alleged, and (3) order Defendants to "take immediate action to reform their policies, procedures, and practices to fully comply with" the statutes.  Id. at 38–39 ¶¶ 1–3.  DRC asks the Court to order Defendants to

> a.  Cease the unnecessary institutionalization of DRC Constituents;
> b.  Provide intensive community-based mental health services to prevent unnecessary institutionalization; [and]
> c.  Ensure that these intensive community services are provided in a manner that is culturally congruent and responsive which, among other things, will address the racial disparities [described in the complaint].

Id. at 39 ¶ 3.

---

[2] DRC states that Defendants violate the ADA

> (a)   by administering the County's mental health system in a way that subjects DRC Constituents to unnecessary institutionalization . . . instead of providing them with services in the community.  42 U.S.C. § 12132;
> (b)   by failing to administer services, programs, and activities in "the most integrated setting" appropriate to the needs of DRC Constituents.  28 C.F.R. § 35.130(d);
> (c)   by using criteria or methods of administration in [the] County's mental health system that subject DRC Constituents to discrimination on the basis of their disabilities.  28 C.F.R. § 35.130(b)(3); [and]
> (d)   by failing to make reasonable modifications to allow DRC Constituents to participate in Defendants' services, programs, and activities in an integrated community setting.

Id. ¶ 155.

United States District Court
Northern District of California

1    Defendants have moved to dismiss DRC's claims for lack of standing and for

2    failure to state a claim for which relief may be granted.  See AHS Mot. to Dismiss (dkt.

3    17); County Mot. to Dismiss (dkt. 39).

4    **II.    LEGAL STANDARD**

5    "The doctrine of standing limits federal judicial power."  Or. Advocacy Ctr. v.

6    Mink, 332 F.3d 1101, 1108 (9th Cir. 2003).  Plaintiffs must have standing to be "entitled to

7    have the court decide the merits of the dispute or of particular issues."  Warth v. Seldin,

8    422 U.S. 490, 498 (1975).  To have standing, plaintiffs must establish (1) that they have

9    suffered an injury in fact, (2) that their injury is fairly traceable to a defendant's conduct,

10   and (3) that their injury would likely be redressed by a favorable decision.  See Lujan v.

11   Defenders of Wildlife, 504 U.S. 555, 560–61 (1992).

12   "The doctrine of associational standing permits an organization to 'sue to redress its

13   members' injuries, even without a showing of injury to the association itself.'"  Mink, 332

14   F.3d at 1109 (quoting United Food & Commercial Workers Union Local 751 v. Brown

15   Group, Inc., 517 U.S. 544, 552 (1996)).  An association has standing to sue on behalf of its

16   members when "(a) its members would otherwise have standing to sue in their own right;

17   (b) the interests it seeks to protect are germane to the organization's purpose; and (c)

18   neither the claim asserted nor the relief requested requires the participation of individual

19   members in the lawsuit."  Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343

20   (1977).[3]

21   A plaintiff with standing may nonetheless have its complaint dismissed under Rule

22   12(b)(6) of the Federal Rules of Civil Procedure if the complaint fails to state a claim for

23   which relief may be granted.  Dismissal may be based on either "the lack of a cognizable

24   legal theory or the absence of sufficient facts alleged under a cognizable legal theory."

25   Godecke v. Kinetic Concepts, Inc., 937 F.3d 1201, 1208 (9th Cir. 2019).  To avoid

26

27

28

---

[3] Because these requirements derive from Article III, the mere fact that Congress has statutorily designated an advocacy system under, for example, PAIMI, does not guarantee that the advocacy system has standing in a particular case.  See Mink, 322 F.3d at 1110.

United States District Court
Northern District of California

dismissal under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 697 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 50 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678. When evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

If a court dismisses a complaint for failure to state a claim, it should "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). A court has discretion to deny leave to amend due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendment previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir. 2008).

## III. DISCUSSION

Although AHS and the County Defendants have separately moved to dismiss DRC's claims, their arguments overlap. AHS argues that (1) DRC lacks standing as to AHS because there is no Article III case or controversy as to AHS and DRC lacks associational standing, see AHS Mot. to Dismiss at 10, 15, and (2) DRC fails to state a disability discrimination claim for which relief may be granted, id. at 17. The County Defendants argue that (1) DRC lacks standing as to them because DRC's "exemplars" have not "suffered an injury-in-fact that [the] ADA remedies," see County Mot. to Dismiss at 17–21, (2) DRC fails to state a disability discrimination claim for which relief may be

1    granted, id. at 11–17, (3) DRC's claims present non-justiciable political questions, id. at

2    21, and (4) the County Defendants cannot be liable for AHS's conduct, id. at 22.

3         The Court holds that DRC has standing to sue AHS and the County Defendants, but

4    that DRC has not stated a claim for which relief may be granted.  DRC has failed to

5    plausibly allege disability discrimination under the relevant statutes.  Thus, the Court

6    grants Defendants' motions to dismiss with leave to amend.

7         **A.    Standing**

8         Putting aside the merits of DRC's underlying claims, DRC has standing to sue

9    Defendants because DRC's allegations establish that its Constituents have suffered injuries

10   fairly traceable to Defendants' conduct, and those injuries would likely be redressed if

11   DRC's claims succeeded.  See Lujan, 504 U.S. at 560–61.  DRC has alleged that its

12   Constituents have been unnecessarily institutionalized and continue to face a risk of

13   unnecessary institutionalization as a result of Defendants' practices and lack of services.

14   And DRC asks the Court to order Defendants to change their practices and expand their

15   services.  That is enough for standing.  See id.; Hunt, 432 U.S. at 343.

16        **1.    Standing: Claims against AHS**

17        AHS argues that DRC lacks standing to sue AHS because only the County

18   Defendants can provide the relief that DRC seeks.  See AHS Mot. to Dismiss at 14.  AHS

19   argues that, as a hospital, it cannot cease unnecessary institutionalization of DRC

20   Constituents, provide intensive community-based mental health services, or ensure that

21   those services are culturally congruent.  See id. at 8, 11.  Insofar as AHS advances these

22   arguments to challenge DRC's standing, these arguments fail.

23        Although it may be true that AHS cannot provide community-based services, DRC

24   has nonetheless pleaded an injury traceable to AHS's conduct that could be redressed by a

25   favorable decision.  See Lujan, 504 U.S. at 560–61.  DRC alleges that its Constituents are

26   injured because they are institutionalized too often and face an unreasonable risk of

27   institutionalization.  Complaint ¶¶ 6, 107.  DRC alleges that AHS's conduct causes these

28   injuries because AHS holds patients "longer than clinically appropriate," does not

United States District Court
Northern District of California

United States District Court
Northern District of California

1   "develop individualized treatment and discharge plans," and fails to timely coordinate

2   "with the County, ACBHCS, and community-based service providers."  Complaint ¶ 6.

3   Put differently, AHS unjustifiably retains patients and fails to take actions that would

4   reduce their risk of future institutionalization.  And DRC requests that the Court order

5   AHS to change these practices.  Id. at 39 ¶ 3.

6          AHS's associational standing argument fares no better.  AHS does not dispute that

7   DRC's constituents are properly considered "members" of DRC, that DRC seeks to protect

8   interests germane to DRC's purpose, or that DRC's claims require individual members to

9   participate in this suit.  See Hunt, 432 U.S. at 343.  Instead, AHS argues that DRC's

10  Constituents lack standing to sue as individuals because AHS cannot provide the relief

11  requested.  AHS Mot. to Dismiss at 15–17.  Thus, AHS's associational standing argument

12  duplicates AHS's argument that it cannot provide the relief that DRC requests.  The Court

13  rejects it for the same reason.

14         "[S]tanding in no way depends on the merits of the plaintiff's contention that

15  particular conduct is illegal."  Warth, 422 U.S. at 500.  But AHS's standing arguments are

16  merits arguments in disguise; they rest on the premise that AHS is not legally obligated to

17  provide the relief that DRC requests.  The Court addresses that merits question below.  See

18  infra Part III.B.2.a.

19                 **2.      Standing: Claims against County Defendants**

20         The County Defendants argue that DRC lacks standing because DRC "has not

21  pleaded that any of the exemplar constituents have suffered an injury-in-fact of the type

22  recognized by the ADA."  County Mot. to Dismiss at 19.

23         This argument is similarly misplaced.  The County Defendants' focus on whether

24  DRC has pleaded an injury "recognized by the ADA" confuses standing with the merits.

25  See Warth, 422 U.S. at 500.  As discussed above, DRC must show that "its members

26  would . . . have standing to sue in their own right."  Hunt, 432 U.S. at 343.  Under Article

27  III, the question is whether DRC has shown that its members have suffered an injury-in-

28  fact, causation, and redressability, see Lujan, 504 U.S. at 560–61, regardless whether those

members would be entitled to relief on the merits.  DRC's allegations satisfy these requirements.  DRC alleges that its Constituents have been unnecessarily institutionalized and that, as County residents with mental illness, they continue to suffer an unnecessary risk of institutionalization.  As discussed in more detail below, the Ninth Circuit has held that plaintiffs not currently institutionalized may assert claims under the ADA based on government conduct that creates such "risk."  <u>M.R. v. Dreyfus</u>, 663 F.3d 1100, 1118 (9th Cir. 2011).  DRC alleges that the unnecessary risk faced by these Constituents is caused in part by the County Defendants' failure to provide the community-based services that DRC seeks.  And if the County Defendants provided those services, DRC alleges that it would remedy its Constituents' unnecessary institutionalization and risk thereof.[4]

The County Defendants' additional argument that DRC lacks standing because the four exemplars in DRC's Complaint would lack standing as individuals, <u>see</u> County Mot. to Dismiss at 18–20, fails for two reasons.  First, DRC is not required to identify individual Constituents who satisfy each element of standing.  There is no dispute that DRC's "constituents are the functional equivalent of [an organization's] members."  <u>Mink</u>, 322 F.3d at 1112.  The question is thus whether DRC has established that "at least one" of its Constituents "would have had standing," <u>id.</u> (citation omitted), and DRC's general allegations regarding its Constituents and the services that Defendants provide satisfy this test.  Given DRC's broad allegations of the harms suffered by mentally ill individuals in the County, it is "relatively clear . . . that one or more members have been or will be adversely affected by a defendant's action."  <u>National Council of La Raza v. Cegavske</u>, 800 F.3d 1032, 1041 (9th Cir. 2015).  Therefore, DRC would have to "identify . . . a particular member" with standing only if Defendants could not otherwise "understand and respond to" DRC's claims.  <u>Id.</u>  The County Defendants have not persuasively shown that they are unable to understand or respond to DRC's claims; instead, they merely point to

---

[4] For the same reason, the County's argument that DRC's exemplars' hospitalizations were not "caused by an <u>Olmstead</u> violation," <u>see</u> County Reply (dkt. 48) at 6, goes to the merits, not standing.

the weakness of those claims on the merits.  See County Mot. to Dismiss at 18; County Reply at 8–12.  Second, even if DRC were required to identify specific Constituents with standing, DRC's exemplars would have standing as individuals.  As County residents who suffer from mental illness, who have experienced alleged unnecessary institutionalization, and who continue to face an alleged risk of unnecessary institutionalization, see Complaint ¶¶ 29–49, DRC has adequately pleaded that these exemplars have suffered injuries caused by Defendants' failure to provide certain services.  Whether those injuries give rise to a claim under the ADA is a separate question.  The Court now turns to that question.

### B.    Disability Discrimination

Defendants argue that DRC fails to state a claim for which relief may be granted. See AHS Mot. to Dismiss at 17; County Mot. to Dismiss at 11.  In particular, AHS argues that because the County is responsible for Community-based treatment, DRC has failed to state with particularity how AHS's conduct violates the "integration mandate" articulated in Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581 (1999).  AHS Mot. to Dismiss at 19. The County Defendants argue that DRC is requesting a "fundamental alteration" of the County's behavioral health system, County Mot. to Dismiss at 12, and that DRC's claims do not satisfy the elements articulated in Olmstead and its progeny, see id. at 16–17.

The Court grants Defendants' motions to dismiss with leave to amend because DRC's allegations do not state a claim for relief under Olmstead.

### 1.    Legal Framework

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.[5]  Congress instructed the Attorney General to promulgate

---

[5] "The term 'qualified individual with a disability' means an individual with a disability who . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).  A "public entity" includes "any State or local government," and "any department, agency, [or] special purpose district."  Id. §§ 12131(1)(A), (B).

United States District Court
Northern District of California

1    regulations implementing Title II.  See id. § 12134(a).  In addition to the statute's general

2    anti-discrimination rule, these regulations forbid public entities from using "criteria or

3    methods of administration . . . that have the effect of subjecting qualified individuals with

4    disabilities to discrimination on the basis of disability," or "that perpetuate the

5    discrimination of another public entity if both public entities are subject to common

6    administrative control."  28 C.F.R. §§ 35.130(b)(3)(i), (iii).

7         As relevant here, disability discrimination includes providing services in an

8    institutional setting that could be provided in a less restrictive setting, subject to certain

9    caveats.  Public entities must "administer services, programs, and activities in the most

10   integrated setting appropriate to the needs of qualified individuals with disabilities."  28

11   C.F.R. § 35.130(d).  The "most integrated setting appropriate" means "a setting that

12   enables individuals with disabilities to interact with non-disabled persons to the fullest

13   extent possible."  Olmstead, 527 U.S. at 592 (quoting 28 C.F.R. pt. 35, App. A, p.450

14   (1998)).  In promulgating this regulation, "the Attorney General concluded that unjustified

15   placement or retention of persons in institutions, severely limiting their exposure to the

16   outside community, constitutes a form of discrimination."  Olmstead, 527 U.S. at 596.

17   And the Supreme Court has since confirmed that "[u]njustified isolation . . . is properly

18   regarded as discrimination based on disability."  Id. at 597.

19        In this context, however, unjustified isolation does not mean isolation that could be

20   avoided if a state or public entity simply provided more or better services.  Olmstead did

21   not establish that state or local governments are subject to a particular "standard of care" in

22   their provision of "medical services . . . or that the ADA requires States to provide a

23   certain level of benefits to individuals with disabilities."  527 U.S. at 603 n.14.  Instead, it

24   established "that States must adhere to the ADA's nondiscrimination requirement with

25   regard to the services they in fact provide."  Id.  As the Ninth Circuit has explained,

26   "where the issue is the location of services, not whether services will be provided,

27   Olmstead controls."  Townsend v. Quasim, 328 F.3d 511, 517 (9th Cir. 2003) (emphasis in

28   original).  For example, Townsend addressed a request that the plaintiff receive services

                                      14

1   for which he was eligible "in the community-based adult home where he lives, rather than

2   the nursing home setting the state require[d]." Id.

3        The Ninth Circuit has held that plaintiffs not currently institutionalized may assert

4   Olmstead claims to challenge government actions that create a "risk" of "unnecessary

5   institutionalization" in order to receive services.  M.R. v. Dreyfus, 663 F.3d 1100, 1118

6   (9th Cir. 2011) (citation omitted), as amended 697 F.3d 706 (9th Cir. 2012).  For example,

7   in M.R. v. Dreyfus, certain Washington residents had been eligible for "personal care

8   services," meaning "assistance in performing basic life activities" that they could not

9   perform on their own because of their disabilities.  Id. at 663.  Washington reduced

10  available personal care service hours by 10 percent.  Id.  The Ninth Circuit held that

11  plaintiffs challenging the reduction stated a disability discrimination claim because the

12  reduction would "substantially increase the risk" that recipients of these services would

13  "be institutionalized in order to receive [the] care" they had been receiving in a community

14  setting.  Id.

15       If a plaintiff plausibly alleges a failure to provide services in the most integrated

16  setting appropriate, another regulation requires public entities to "make reasonable

17  modifications in policies, practices, or procedures" that are "necessary to avoid" this sort

18  of discrimination, "unless the public entity can demonstrate that making the modifications

19  would fundamentally alter the nature of the service, program, or activity."  28 C.F.R.

20  § 35.130(b)(7)(i).  If a public entity resists making modifications based on a "fundamental-

21  alteration defense," courts must consider the "resources available" to the government

22  entity, including "the range of services the [government] provides to others with mental

23  disabilities, and the [government]'s obligation to mete out those services equitably."

24  Olmstead, 527 U.S. at 597.[6]  If a public entity is "genuinely and effectively in the process

25  of deinstitutionalizing disabled persons 'with an even hand,'" courts "will not interfere."

26  Arc of Washington State Inc. v. Braddock, 427 F.3d 615, 620 (2005) (quoting Olmstead,

27  _____

28  [6] Although this section of Olmstead commanded only four votes, the Ninth Circuit has held that it
    "controls."  Townsend, 328 F.3d at 519 n.3.

United States District Court
Northern District of California

1   527 U.S. at 605–06).[7]

2   Combining these rules, when a state provides a particular service, the state must

3   "provide community-based treatment for [qualified] persons with . . . disabilities when the

4   State's treatment professionals determine that such placement is appropriate, the affected

5   persons do not oppose such treatment, and the placement can be reasonably

6   accommodated, taking into account the resources available to the State and the needs of

7   others with . . . disabilities." Olmstead, 527 U.S. at 607. Failure to do so constitutes

8   disability discrimination. Id.

9   The parties agree that § 504 of the Rehabilitation Act imposes substantially the

10  same requirements on public entities, see AHS Mot. to Dismiss at 18; Opp. to AHS Mot. to

11  Dismiss (dkt. 33) at 15–16; County Mot. to Dismiss at 10 n.1, and that a violation under

12  Title II or § 504 is also a violation of California Government Code section 11135, see AHS

13  Mot. to Dismiss at 18 & n.75; Complaint ¶¶ 166–173; County Mot. to Dismiss at 10 n.1.

14  **2.    Analysis**

15  The Court concludes that DRC has not plausibly alleged disability discrimination

16  by AHS or the County Defendants.

17  **a.    Claims against AHS**

18  Because DRC does not allege that AHS is responsible for providing community-

19  based treatment programs, DRC's allegations against AHS are narrower than those against

20  the County Defendants. As discussed above, DRC alleges that AHS subjects DRC

21  Constituents to unnecessary institutionalization and a risk thereof by (1) failing to develop

22  individualized treatment and discharge plans, (2) failing to ensure timely and effective

23  implementation and coordination with the County Defendants and other relevant entities,

24

25  [7] Arc of Washington addressed an Olmstead claim that Washington's Home and Community-Based Services waiver program, which provided services is noninstitutional settings for qualified persons, was "too small to accommodate the state's population of eligible participants." 427 F.3d

26  at 619. Thus, like M.R. v. Dreyfus, Arc of Washington addressed the location where services

27  provided by the state would be provided. The Ninth Circuit concluded that "forcing the state to apply for an increase in its Medicaid waiver program cap" in order to accommodate more eligible

28  participants would constitute "a fundamental alteration" and was thus "not required by the ADA." Id. at 622.

United States District Court
Northern District of California

1    and (3) holding Constituents for longer than clinically appropriate.  See Complaint ¶ 6.

2         AHS's alleged failure to develop sufficiently individualized treatment and discharge

3    plans does not constitute disability discrimination because it relates to whether AHS

4    provides a service, not where AHS provides that service.  See Townsend, 328 F.3d at 517.

5    In this regard, DRC's claim amounts to an assertion that AHS's services are not up to

6    DRC's preferred "standard of care."  Olmstead, 527 U.S. at 603 n.14.  But the requirement

7    that AHS treat patients "in the most integrated setting appropriate," 28 C.F.R. § 35.130(d),

8    is not a requirement that AHS provide patients with specific treatment.  Further, DRC has

9    not plausibly alleged that AHS's failure to provide individualized treatment plans creates a

10   "risk" of "unnecessary institutionalization" in the relevant sense.  M.R. v. Dreyfus, 663

11   F.3d at 1118.  To state such a claim, DRC would have to point to a service that its patients

12   would receive in a community setting, like the "personal care services" in M.R. v. Dreyfus,

13   but instead risk receiving in an institutional setting due to AHS's failure to provide such

14   individualized plans.  See id.  DRC plausibly alleges that AHS's failure to provide

15   individualized plans leads to worse mental health outcomes for Constituents, including a

16   higher likelihood of future institutionalization.  But even under Olmstead's broad

17   definition of discrimination, worse outcomes are not equivalent to discrimination.

18        Similarly, DRC's allegations that AHS does not effectively communicate with

19   community service providers, collaborate with ACBHCS on care plans, or help ACBHCS

20   optimize mental health services fail to show that AHS has engaged in disability

21   discrimination.  Once more, these allegations do not establish any direct discrimination

22   because they neither identify a specific service currently provided in an institutional setting

23   nor argue that such a service should be provided in a more integrated setting.  See

24   Olmstead, 527 U.S. at 596.  And once again, these allegations do not identify a "risk" that

25   specific services will be delivered in an institutional setting that should be delivered in a

26   community setting.

27        DRC's allegation that AHS holds Constituents "longer than clinically appropriate,"

28   Complaint ¶ 6, also falls short of establishing disability discrimination.  To state a claim

United States District Court
Northern District of California

17

United States District Court
Northern District of California

based on AHS's retention decisions, DRC must first allege that the public entity's "treatment professionals" have determined that "community-based treatment . . . is appropriate." 527 U.S. at 607. DRC alleges that under the "County's own estimates," a significant number of PES detainees "do not meet medical necessity criteria for inpatient psychiatric services." Complaint ¶ 79. But PES is where patients are initially detained by the County—AHS plays no role there. DRC also alleges that AHS needlessly extends stays at John George, and that these stays are called "administrative" because they are not "medically necessary." Id. ¶ 85. But DRC does not specifically allege that AHS's "treatment professionals" have determined that community-based treatment would be more appropriate for patients subject to these stays. Olmstead, 52 U.S. at 607. Indeed, DRC does not identify what specific services AHS provides during these stays that could be provided in other settings—or that AHS could provide any services in a community setting, given that AHS merely contracts with ACBHCS to provide inpatient care. See Complaint ¶¶ 52, 66.

In sum, AHS's failures to take certain actions that might improve DRC's Constituents' mental health do not, without more, constitute discrimination. And even if the County Defendants engaged in discrimination (which the Court addresses below), and if AHS's failures have "compounded" the resulting harms, see Complaint ¶ 131, that would not make AHS's failures discrimination.

Because DRC could conceivably cure these deficiencies in an amended complaint, the Court grants AHS's motion to dismiss with leave to amend. Leadsinger, 512 F.3d at 532. For DRC to state a claim, it must provide more detailed allegations that fit within the framework of Olmstead and its progeny.

### b.    Claims against County Defendants

The County Defendants argue that DRC fails to state an Olmstead claim against them because DRC seeks "the vast implementation of multiple new and expanded programs" rather than pointing to specific services that are being provided in institutional settings but that could be provided in community settings. County Mot. to Dismiss at 11.

18

United States District Court
Northern District of California

1   The County Defendants also point out that to state a claim under <u>Olmstead</u>, DRC must

2   show that the County's "own professionals determined that community-based treatment

3   would be appropriate." <u>Id.</u> at 16. DRC argues that it "does not seek new types of

4   community-based services." Opp. to County Mot. to Dismiss (dkt. 47) at 2. Instead, DRC

5   argues that it "seeks to expand . . . existing features of the County Defendants' mental

6   health program," and that such an expansion would "prevent the needless

7   institutionalization of DRC constituents." <u>Id.</u> at 2–3.

8       The County Defendants are correct that DRC has not stated a claim for which relief

9   may be granted. DRC seeks to broaden <u>Olmstead</u> to provide a remedy for when state and

10  local governments deliver services that, regardless of setting, could be expanded to reduce

11  the County's rate of institutionalization. <u>See</u> Opp. to County Mot. to Dismiss at 2–3, 11.

12  But <u>Olmstead</u> specifically rejected this sort of theory, which would require states and

13  counties "to provide a certain level of benefits to individuals with disabilities." 527 U.S. at

14  603 n.14. <u>Olmstead</u> provides a remedy for when state and local governments deliver

15  services in institutional settings that could reasonably be delivered in community

16  settings—or when government conduct creates an unnecessary risk that patients will need

17  to enter an institution to obtain services they could otherwise obtain in the community.

18  <u>See Townsend</u>, 328 F.3d at 517. It does not provide a remedy for when government

19  entities could generally do more to keep people from being institutionalized.

20      Because <u>Olmstead</u> applies "where the issue is the <u>location</u> of services, not <u>whether</u>

21  services will be provided, <u>Townsend</u>, 328 F.3d at 517 (emphasis in original), DRC must

22  point to services being provided in institutional settings that could be provided in the

23  community, or a risk that DRC Constituents will need to endure institutionalization to

24  receive specific services that could be provided in the community. Although DRC's

25  Complaint requests that Defendants relocate services "from institutions to community-

26  based settings," Complaint ¶ 112, DRC does not plead with particularity which services

27  the County Defendants must relocate. DRC must also plausibly allege that the relevant

28  entity's treatment professionals have determined that community placement for receipt of

United States District Court
Northern District of California

1  these specific services is appropriate; that the relevant patients do not oppose such

2  treatment; and that the community placement (with respect to these specific services) can

3  be reasonably accommodated.  See Olmstead, 527 U.S. at 607.  DRC's Complaint lacks

4  these crucial details.

5      In its current form, DRC's Complaint focuses on Defendants' need to expand and

6  strengthen community-based services so that fewer County residents are institutionalized.

7  But the County Defendants' alleged shortcomings in reducing institutionalization are not

8  enough to plausibly state a disability discrimination claim.

9      DRC may be able to state Olmstead claims against the County Defendants in an

10  amended complaint.  Therefore, the Court grants the County Defendants' motion to

11  dismiss with leave to amend.  Leadsinger, 512 F.3d at 532.  At this stage, the Court need

12  not consider whether the County Defendants could make "reasonable modifications" to

13  avoid any alleged discrimination, 28 C.F.R. § 35.130(b)(7)(i), or whether the County

14  Defendants are entitled to a "fundamental-alteration defense," Olmstead, 527 U.S. at 597.[8]

15  **IV.    CONCLUSION**

16      For the foregoing reasons, the Court grants Defendants' motions to dismiss with

17  leave to amend.[9]  DRC shall have 30 days from the date of this order to file an amended

18  complaint.

19      **IT IS SO ORDERED.**

20      Dated: January 21, 2021



CHARLES R. BREYER
United States District Judge

21

22

23

24

---

25  [8] Similarly, the Court does not address whether the Court may evaluate a fundamental alteration defense at the motion to dismiss stage, see Opp. to County Mot. to Dismiss at 5; County Reply at

26  14–15, or whether DRC's claims present non-justiciable political questions, see County Mot. to Dismiss at 21.  And because DRC has not stated a claim against AHS, the Court does not address

27  the County Defendants' argument that they cannot be liable for AHS's conduct. Id. at 22.
[9] AHS's Motion to Strike DRC's allegations relating to racial disparities and the COVID-19

28  pandemic, see AHS Mot. to Dismiss at 21, is denied.  DRC's motion to file a sur-reply (dkt. 45) is granted.