Kimberly Swain (SBN 100340)
Kim.Swain@disabilityrightsca.org
Jennifer Stark (SBN 267062)
Jennifer.Stark@disabilityrightsca.org
Samuel Jain (SBN 295739)
Samuel.Jain@disabilityrightsca.org
Sarah Gregory (SBN 303973)
Sarah.Gregory@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
1330 Broadway, Suite 500
Oakland, CA 94612
Tel:    (510) 267-1200
Fax:    (510) 267-1201

Linda M. Dardarian (SBN 131001)
ldardarian@gbdhlegal.com
Andrew P. Lee (SBN 245903)
alee@gbdhlegal.com
Raymond A. Wendell (SBN 298333)
rwendell@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
Tel:    (510) 763-9800
Fax:    (510) 835-1417

Attorneys for Plaintiff
*(Additional Counsel for Plaintiff listed on following page)*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DISABILITY RIGHTS CALIFORNIA, a California nonprofit corporation,<br><br>            Plaintiff,<br><br>vs.<br><br>COUNTY OF ALAMEDA and ALAMEDA COUNTY BEHAVIORAL HEALTH CARE SERVICES,<br><br>            Defendants. | Case No. 5:20-cv-05256-CRB<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Before:  Hon. Charles R. Breyer<br><br>Trial Date:    None Set |

1    Ira A. Burnim (SBN 406154) (*pro hac vice*)
     irabster@gmail.com
2    Jennifer Mathis (SBN 444510) (*pro hac vice*)
     jenniferm@bazelon.org
3    Lewis Bossing (SBN 227492)
     lewisb@bazelon.org
4    BAZELON CENTER FOR MENTAL HEALTH LAW
     1101 15th Street NW, Suite 1212
5    Washington, DC 20005
     Tel:    (202) 467-5730
6    Fax:    (202) 223-0409

7    Claudia Center (SBN 158255)
     ccenter@dredf.org
8    Sydney Pickern (SBN 303908)
     spickern@dredf.org
9    DISABILITY RIGHTS EDUCATION AND DEFENSE FUND
     3075 Adeline Street Suite 210
10   Berkeley, CA 94703
     Tel:    (510) 644-2555
11   Fax:    (510) 841-8645

12   Aaron J. Fischer (SBN 247391)
     ajf@aaronfischerlaw.com
13   LAW OFFICE OF AARON J. FISCHER
     2001 Addison Street, Suite 300
14   Berkeley, CA 94704
     Tel:    (510) 806-7366
15   Fax:    (510) 694-6314

16   Attorneys for Plaintiff

17

18

19

20

21

22

23

24

25

26

27

28

# I.    <u>INTRODUCTION</u>

1.      Plaintiff Disability Rights California ("DRC" or "Plaintiff") brings this action for declaratory and injunctive relief against Alameda County and Alameda County Behavioral Health Care Services ("ACBHCS") (collectively, "Defendants").  DRC challenges Defendants' discrimination against adults with serious mental health disabilities who repeatedly cycle into and out of Alameda County's psychiatric institutions.  DRC asks this Court to direct Defendants to provide necessary community-based mental health services to end the avoidable institutionalization of hundreds of people with serious mental health disabilities.

2.      Defendants' failure to provide community-based services needlessly and illegally causes many adults with serious mental health disabilities, especially Black adults with such disabilities, to cycle into and out of Alameda County's psychiatric institutions and puts them at constant and high risk of unnecessary and repeated institutionalizations.  Alameda County's psychiatric detention rate for people with mental health disabilities is more than three-and-a-half times the California statewide average.  During a recent two-year period, over 2,300 people were detained at the County's psychiatric facilities more than three times, the majority of whom were Black.  Hundreds of people with serious mental health disabilities were detained more than 10 times, and some individuals were detained more than 100 times.  These "cycling admissions" of individuals with high needs are "the hallmark of a failed system."  *United States v. Mississippi*, 400 F. Supp. 3d 546, 555 (S.D. Miss. 2019).

3.      DRC is California's Protection and Advocacy ("P&A") system.  It is empowered and charged by federal law to protect the rights of California residents with mental health disabilities.  In 2018, DRC opened an investigation into Alameda County's practices regarding unnecessary segregation in the County's psychiatric institutions.  These institutions include John George Psychiatric Hospital ("John George"), a public psychiatric hospital, and the Villa Fairmont Mental Health Rehabilitation Center ("Villa Fairmont"), a locked institution located on the same campus as John George.  On November 1, 2019, DRC issued a written finding detailing the results of DRC's investigation.  Specifically, DRC found that Defendants' actions constitute abuse and/or neglect based on, *inter alia*, Defendants' providing services in institutions rather than the community.  Because

Defendants have failed to implement a remedy, DRC is compelled to now file suit.

4.     DRC brings this action on behalf of adult Alameda County residents who (a) have serious mental health disabilities, (b) have been repeatedly institutionalized in John George and/or Villa Fairmont, and (c) are at serious risk of being re-institutionalized in John George or Villa Fairmont in the future.  For the purpose of this action, individuals who have been repeatedly institutionalized in John George and/or Villa Fairmont and are at serious risk of being re-institutionalized at John George or Villa Fairmont in the future include individuals who have been institutionalized in these facilities three or more times in the last 24 months.  Many of these individuals also cycle through jail and emergency rooms.  Many are homeless.  DRC refers to these individuals— who are beneficiaries of DRC's activities and advocacy—as "DRC Constituents."

5.     Defendants fail to provide DRC Constituents the mental health services they need in the community to avoid institutionalization.  Defendants require DRC Constituents to enter County institutions to receive the mental health services they need.  These services include the following: rehabilitative mental health services, including medication support services; intensive case management; services for psychiatric crises; substance use disorder treatment; and residential services.

6.     Defendants' failure to provide DRC Constituents with needed services in the community leads to their being institutionalized at John George, after which many are institutionalized at Villa Fairmont.  At these two psychiatric institutions, Defendants provide DRC Constituents the mental health services that they are denied while residing in the community.

7.     If Defendants provided DRC Constituents the mental health services they need in the community, most DRC Constituents could avoid repeated admissions into psychiatric institutions, stays in jail, and visits to emergency rooms.

8.     Defendants' practice of providing DRC Constituents needed mental health care in County institutions instead of in the community has dire effects.  It undermines their participation in community life.  It contributes to homelessness and incarceration among DRC Constituents.  It perpetuates the stereotype that they are incapable of living successfully in the community.

9.     Defendants' over-reliance on institutional care also places DRC Constituents at heightened risk of contracting COVID-19.  Unlike residents without disabilities, who are encouraged

by the County to shelter in place, DRC Constituents are detained in congregate settings due to the lack of services in the community. Congregate facilities like the County's psychiatric institutions and jail are incubators for COVID-19 and hasten its spread.

10.     Defendants' actions violate Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131-12134, Section 504 of the Rehabilitation Act of 1973 ("Section 504" or the "Rehabilitation Act"), 29 U.S.C. §§ 794 *et seq.*, and California Government Code sections 11135-11139 ("Section 11135"). The ADA and Rehabilitation Act forbid all forms of discrimination against persons with disabilities, including needless institutionalization. *Olmstead v. L.C ex rel. Zimring*, 527 U.S. 581, 597 (1999). California law provides similar protections.

11.     Defendants' methods of delivering mental health services results in discrimination, by leading to repeated institutionalization of DRC Constituents and placing DRC Constituents at serious risk of repeated institutionalization in the future. The County's system has irreparably harmed DRC Constituents and will continue to irreparably harm them unless this Court intervenes.

## II.     <u>JURISDICTION</u>

12.     This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201, and 28 U.S.C. § 2202. A substantial, actual, and continuing controversy exists between the parties.

13.     The Court's exercise of supplemental jurisdiction over Plaintiff's claims under state law is proper, as the state law claims "are so related to [Plaintiff's claims] that they form part of the same case or controversy." 28 U.S.C. § 1367(a).

## III.     <u>VENUE</u>

14.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. §§ 1391(b)(1) and (2).

15.     Defendants reside or are organized in the Northern District of California and the events or omissions giving rise to this action arose in Alameda County, which is located within the Northern District of California. Plaintiff Disability Rights California also has offices in Alameda County, and has constituents who reside in Alameda County.

## IV.   PARTIES

### A.   Plaintiff DRC and Its Constituents

16.    Plaintiff Disability Rights California is a federally funded non-profit corporation organized under the laws of the State of California, with offices in Oakland, Sacramento, Los Angeles, Fresno, Ontario, and San Diego.  DRC's mission is to advocate, educate, investigate, and litigate to advance the rights and dignity of all people with disabilities.

17.    The State of California has designated DRC to serve as California's Protection and Advocacy ("P&A") system for individuals with disabilities, pursuant to the Developmental Disabilities Assistance and Bill of Rights ("DD") Act, 42 U.S.C. §§ 15041 *et seq.*, the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), 42 U.S.C. §§ 10801 *et seq.*, and the Protection and Advocacy of Individual Rights Act, § 29 U.S.C. § 794(e).

18.    PAIMI provides for the establishment and funding of P&A systems, including DRC, to investigate the abuse and neglect of people with mental health disabilities, to engage in protection and advocacy "to ensure that the rights of individuals with mental health disabilities are protected," and "to ensure the enforcement of the Constitution and Federal and State statutes" on behalf of people with mental health disabilities.  42 U.S.C. §§ 10801(b)(1), 10801(b)(2)(A).  As California's P&A system, DRC is authorized to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State."  42 U.S.C. § 10805(a)(1)(B); *see also Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1110 (9th Cir. 2003).

19.    Individuals with serious mental health disabilities have representation in DRC and guide and influence its activities.  DRC is governed by a multi-member board of directors comprised predominantly of people with disabilities and their families.  DRC's board is advised by a PAIMI advisory council, the majority of which, including the advisory council chair, are individuals who have received mental health services or have family members who do.  The PAIMI advisory council has significant input in setting DRC's goals and objectives.  Also, DRC uses surveys, focus groups, and public hearings to collect input from people with disabilities and their communities, and uses that input to set its goals and objectives.

20.    DRC fulfills its federal mandate under PAIMI by providing an array of protection and

1   advocacy services to people with mental health disabilities across California, including individuals

2   who have been unnecessarily institutionalized or who are at risk of such institutionalization.

3       21.     Under this authority, DRC pursues legal remedies on behalf of people with disabilities

4   in California and, in the context of this action, Alameda County residents who (a) have serious mental

5   health disabilities, (b) who have been repeatedly institutionalized in John George and/or Villa

6   Fairmont, and (c) are at serious risk of being re-institutionalized in John George or Villa Fairmont in

7   the future.  For the purpose of this action, individuals "who have been repeatedly institutionalized in

8   John George and/or Villa Fairmont and are at serious risk of being re-institutionalized at John George

9   or Villa Fairmont in the future" include individuals who have been institutionalized in these facilities

10  three or more times in the last 24 months.  There are hundreds, if not thousands, of individuals in

11  Alameda County who meet this definition.  They include individuals currently institutionalized at John

12  George or Villa Fairmont who meet the above definition.  It is on behalf of these individuals,

13  collectively referred to as the "DRC Constituents," that DRC brings this action.  *See Hunt v.*

14  *Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977); *Oregon Advocacy Ctr.*, 322

15  F.3d at 1111-12.

16      22.     DRC Constituents each have a serious mental health disability that substantially limits

17  one or more major life activities.

18      23.     All or virtually all DRC Constituents are eligible to receive services under California's

19  Medicaid program (known as "Medi-Cal"), services funded by California's Mental Health Services

20  Act, and/or services funded through other state or local mental health and housing programs.

21      24.     DRC has standing to bring this action to vindicate the rights of the DRC Constituents

22  under the ADA, the Rehabilitation Act, and state law to be free of unnecessary institutionalization and

23  to receive needed mental health services in their homes and communities.  DRC Constituents have

24  representation and influence in DRC's operations.  The participation of individual DRC Constituents in

25  this lawsuit is not required.  The declaratory and injunctive relief requested is appropriate for DRC to

26  pursue on behalf of its constituents and is germane to DRC's mission and activities.

27      25.     DRC Constituents include the individuals described below.  Each has experienced three

28  or more institutionalizations at John George and/or Villa Fairmont in the last 24 months.

797662.2

26.     In order to avoid future unnecessary institutionalizations, each needs to receive in the community the following services, in sufficient quantity, which the County currently provides them in its psychiatric institutions: rehabilitative mental health services, including medication support services; intensive case management; services for psychiatric crises; substance abuse treatment; and residential services.

27.     Upon information and belief, mental health professionals, including mental health professionals employed by Defendants or their contractors, have determined that DRC Constituents need these services in a community setting to avoid re-institutionalization.  DRC Constituents do not oppose receipt of these services in the community.  These services can be provided to DRC Constituents in the community with reasonable modifications to Defendants' service system.

**1.     Rian Walter**

28.     Rian Walter is a 42-year-old Black Alameda County resident who graduated from UC Berkeley with degrees in Philosophy and English.  He developed a mental health disability when he was 26 years old.  Mr. Walter has a history of psychosis.  He is enrolled in Medi-Cal and is currently an ACBHCS client.

29.     Since 2004, Mr. Walter has been institutionalized at John George approximately ninety (90) times, and four (4) times at Villa Fairmont.  At least four of these institutionalizations occurred in the 24 months before the filing of Plaintiff's Complaint.  He has been incarcerated at Santa Rita Jail on several occasions on charges related to his mental health symptoms.  Mr. Walter believes his repeated institutionalizations have contributed to the instability in his housing and stigmatization by family members.

30.     While institutionalized at John George and Villa Fairmont, Mr. Walter received rehabilitative mental health services, including medication support services; intensive case management; crisis services; substance abuse treatment; and residential services.  However, upon discharge from John George and Villa Fairmont, and while Mr. Walter was living in the community, the County failed to provide him with these mental health services, which he needs to avoid institutionalization.

31.     Mr. Walter does not oppose receipt of these services in the community and, upon

797662.2

information and belief, mental health professionals, including mental health professionals employed by Defendants or their contractors, have determined that it is appropriate to provide the following services to Mr. Walter in a community setting: rehabilitative mental health services, including medication support services; intensive case management; crisis services; substance abuse treatment; and residential services. Indeed, when Defendants previously provided Mr. Walter the mental health services he needed in the community, he was able to live independently and avoid repeated psychiatric hospitalizations. These services can be provided to Mr. Walter in the community with reasonable modifications to Defendants' service system.

32. Currently, Mr. Walter is not receiving the mental health services he needs in the community and, as a result, is at serious risk of re-institutionalization.

**2. KG**[1]

33. KG is a 58-year-old Black Alameda County resident who attended Mills College and San Francisco State, and received her master's degree at UC Berkeley. KG used to have her own tutoring business. She has a history of bipolar disorder, depression, and post-traumatic stress disorder (PTSD). KG is currently homeless.

34. Since 1995, KG has been repeatedly institutionalized, including approximately 50 psychiatric hospitalizations, mostly at John George. She has also been institutionalized at Villa Fairmont. She has been institutionalized at John George at least ten times in the 24 months before the filing of Plaintiff's Complaint. KG believes her repeated institutionalizations have contributed to the instability in her housing and stigmatization by family members.

35. While institutionalized, KG received rehabilitative mental health services including medication support services; intensive case management, crisis services, and residential services. However, upon discharge and while KG was living in the community, Defendants failed to provide KG with these mental health services she needs.

36. On multiple occasions in 2019 and 2020, KG was released from jail, where she was

---

[1] Plaintiff is using a pseudonym for this exemplar to protect the exemplar's privacy.

797662.2

1    incarcerated for minor offenses relating to her mental health symptoms, without being connected to the

2    community-based mental health services she needs.  On other occasions, KG was discharged from

3    John George to homelessness without needed community-based mental health services.

4        37.    The County's failure to provide needed services to KG while she is living in the

5    community caused her to be repeatedly institutionalized at John George and has put her at serious risk

6    of re-institutionalization.

7        38.    Upon information and belief, mental health professionals, including mental health

8    professionals employed by Defendants or their contractors, have determined that it is appropriate to

9    provide the following services to KG in the community: rehabilitative mental health services including

10   medication support services, intensive case management, crisis services, and residential services.  KG

11   does not oppose receipt of these services in the community.  These services can be provided to KG in

12   the community with reasonable modifications to Defendants' service system.

13       **3.    <u>Azizah Ahmad</u>**

14       39.    Azizah Ahmad is a 41-year-old Black Alameda County resident and mother of three

15   children.  She recently worked for the U.S. Census as a census field supervisor and is currently a coach

16   for a tech-related online program.  Ms. Ahmad has been diagnosed with bipolar disorder and post-

17   traumatic stress disorder.  She is currently enrolled in Medi-Cal.

18       40.    In 2019, Ms. Ahmad developed increased symptoms of bipolar disorder due to stressors

19   in her life.  Ms. Ahmad was institutionalized at John George three times in the 24 months before the

20   filing of Plaintiff's Complaint.  At John George, she was provided rehabilitative mental health services

21   including medication support services, intensive case management, crisis services, and residential

22   services.  Upon discharge and while Ms. Ahmad was living in the community, Defendants failed to

23   provide her with these mental health services, which she needs to avoid re-institutionalization.

24       41.    Upon information and belief, mental health professionals, including mental health

25   professionals employed by Defendants or their contractors, have determined that it is appropriate to

26   provide the following services to Ms. Ahmad in a community setting: rehabilitative mental health

27   services including medication support services, intensive case management, and crisis services.  Ms.

28   Ahmad does not oppose receipt of these services in the community.  These services can be provided to

797662.2

Ms. Ahmad in the community with reasonable modifications to Defendants' service system.

42.     The County's failure to provide these services to Ms. Ahmad in the community caused her to be repeatedly institutionalized at John George and put her at serious risk of re-institutionalization.

43.     Ms. Ahmad is terrified of the prospect of being re-institutionalized at John George again.  She describes the difference between receiving mental health services in the community and receiving them in an institution as the difference between "healing" and simply being "kept alive."

**B.     Defendants**

44.     Defendant County of Alameda (the "County" or "Alameda County") is a public entity, duly organized and existing under the laws of the State of California.  The County has the authority and responsibility to provide mental health services to County residents either directly or through the administration of contracts with providers, in both institutions and the community.  Alameda County also operates Santa Rita Jail.  Alameda County is subject to Title II of the ADA, and receives "federal financial assistance," thereby subjecting it to Section 504 of the Rehabilitation Act.  The County is funded directly or receives "financial assistance from the state," thereby subjecting it to California Government Code Section 11135.

45.     Defendant Alameda County Behavioral Health Care Services ("ACBHCS") is the County entity that provides mental health services to Alameda County residents.  ACBHCS is subject to Title II of the ADA, and receives "federal financial assistance," thereby subjecting it to Section 504 of the Rehabilitation Act.  ACBHCS also is funded directly or receives "financial assistance from the state," thereby subjecting it to California Government Code Section 11135.

46.     Defendants are responsible for ensuring that people with serious mental health disabilities are provided services in accordance with federal and state law, including the ADA, Section 504, and Section 11135.

## V.     STATUTORY AND REGULATORY FRAMEWORK

**A.     The Americans with Disabilities Act**

47.     Title II of the ADA applies to all "public entities," including Defendants herein.  42 U.S.C. § 12131(1)(b).  It provides that "no qualified individual with a disability shall, by reason of

9

1   disability… be subjected to discrimination by such entity."  42 U.S.C. § 12132.

2       48.     In enacting the ADA, Congress found that "historically, society has tended to isolate

3   and segregate individuals with disabilities, and, despite some improvements, such forms of

4   discrimination against individuals with disabilities continue to be a serious and pervasive social

5   problem[.]"  42 U.S.C. § 12101(a)(2).  Among the areas in which Congress found that discrimination

6   persists was "institutionalization . . . and access to public services[,]" 42 U.S.C. § 12101(a)(3).

7   "[I]ndividuals with disabilities continually encounter various forms of discrimination, including . . .

8   segregation …."  42 U.S.C. § 12101(a)(5).  According to Congress, "the Nation's proper goals

9   regarding individuals with disabilities are to assure equality of opportunity, full participation,

10   independent living, and economic self-sufficiency for such individuals."  42 U.S.C. § 12101(a)(7).

11       49.     More than twenty-one years ago, the United States Supreme Court in *Olmstead v. L.C.*

12   *ex rel. Zimring*, held that the unnecessary institutionalization of individuals with disabilities is a form

13   of discrimination prohibited under Title II of the ADA.  527 U.S. 581, 597 (1999).  In that case, the

14   Supreme Court directed that public entities serve persons with disabilities in the community rather than

15   in institutions when: (1) providing community-based services is appropriate; (2) the individual does

16   not oppose receiving such services; and (3) the provision of community-based services can be

17   reasonably accommodated, considering the resources available to the entity and the needs of other

18   persons with disabilities.  *Id.* at 607.

19       50.     The regulations implementing Title II of the ADA similarly state that "[a] public entity

20   shall administer services . . . in the most integrated setting appropriate to the needs of qualified

21   individuals with disabilities."  28 C.F.R. § 35.130(d); [2] *see also* 28 C.F.R. § 41.51(d) (same standard

22   for entities covered by the Rehabilitation Act); *Olmstead*, 527 U.S. at 592 (quoting Title II regulation).

23   The integration mandate requires public entities, like the Defendants, to provide individuals with

24

25   [2] Regulations implementing Title II of the ADA also provide that "[a] public entity may not, directly
    or through contractual or other arrangements, utilize criteria or …methods of administration: (i) that
26   have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of
    disability;  (ii) that have the purpose or effect of defeating or substantially impairing accomplishment
27   of the objectives of the entity's program with respect to individuals with disabilities; …."  28 C.F.R. §
    35.130(b)(3); 28 C.F.R. § 41.51(b)(3); 45 C.F.R. § 84.4(b)(4).
28

10

797662.2

disabilities "opportunities to live, work, and receive services in the greater community, like individuals without disabilities."  U.S. Dep't of Justice, *Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and* Olmstead v. L.C., question 1, https://www.ada.gov/olmstead/q&a_olmstead.htm (last updated February 25, 2020) ("Department of Justice Statement on Integration Mandate").[3]  The "most integrated setting" is the "setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible."  28 C.F.R. pt. 35, App. A, p. 450 (2010).  To satisfy this mandate, public entities must provide individuals services in the community rather than in institutions, when appropriate to their needs, including "the services and supports necessary for [their] community tenure" and "opportunities to live in their own apartments or family homes, with necessary supports."  Department of Justice Statement on Integration Mandate, question 15.

51.     Title II's "integration mandate" protects both people who are currently institutionalized and people with disabilities who are at serious risk of re-institutionalization.  *See, e.g.*, *M.R. v. Dreyfus*, 697 F.3d 706, 720, 734 (9th Cir. 2012).  As the U.S. Department of Justice has explained:

> [T]he ADA and the *Olmstead* decision extend to persons at serious risk of institutionalization or segregation and are not limited to individuals currently in institutional or other segregated settings.  Individuals need not wait until the harm of institutionalization or segregation occurs or is imminent.  *For example, a plaintiff could show sufficient risk of institutionalization to make out an Olmstead violation if a public entity's failure to provide community services ... will likely ... lead to the individual's eventual placement in an institution.*

[3] *See Olmstead*, 527 U.S. at 598 ("[T]he well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'") (quoting and citing *Bragdon*); *Bragdon v. Abbott*, 524 U.S. 624, 642 (same, quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-140 (1944)); *Steimel v. Wernert*, 823 F.3d 902, 911 (7th Cir. 2016) ("In general, we defer to an agency's interpretation of its own regulation unless the agency's interpretation is 'plainly erroneous or inconsistent with the regulation' or 'there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question.'  We see no such flaws in the path that DOJ has taken.") (deferring to Department of Justice Statement on Integration Mandate) (citation omitted); *Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013) ("Because Congress instructed the DOJ to issue regulations regarding Title II, we are especially swayed by the DOJ's determination that 'the ADA and the Olmstead decision extend to persons at serious risk of institutionalization or segregation and are not limited to individuals currently in institutional or other segregated settings.'") (quoting Department of Justice Statement); *see also Davis v. Shah*, 821 F.3d 231, 263 (2d Cir. 2016) ("We find DOJ's and our sister circuits' interpretation of *Olmstead* both consistent with the integration mandate and well-reasoned, and we adopt it as our own.").

797662.2

Department of Justice Statement on Integration Mandate, question 6 (emphasis added).

52.     In *Olmstead*, the defendants' treating professionals had judged the two plaintiffs "appropriate" for community care.  That is, defendants' treating professionals had determined the two plaintiffs could receive the care they needed in the community.  527 U.S. at 602.  The Supreme Court explained that *Olmstead* plaintiffs must be "qualified" for a community-based program, and indicated that lower courts should defer to "reasonable assessments" of "the State's" treating professionals when considering whether an individual could be appropriately served in the community.  *Id.* at 601-02.  The Supreme Court did not require, as a pre-condition for asserting a legal claim, that treating professionals have actually made such a determination.

53.     In authoritative guidance, the U.S. Department of Justice has found that such a determination by treating professionals is not required to assert a claim under the ADA or *Olmstead*:

> **What evidence may an individual rely on to establish that an integrated setting is appropriate?**
>
> A: An individual may rely on a variety of forms of evidence to establish that an integrated setting is appropriate.  A reasonable, objective assessment by a public entity's treating professional is one, but only one, such avenue. … However, the ADA and its regulations do not require an individual to have had a state treating professional make such a determination.  People with disabilities can also present their own independent evidence of the appropriateness of an integrated setting ….  This evidence may come from … community-based organizations that provide services to people with disabilities outside of institutional settings, or from any other relevant source.  Limiting the evidence on which Olmstead plaintiffs may rely would enable public entities to circumvent their Olmstead requirements by failing to require professionals to make recommendations regarding the ability of individuals to be served in more integrated settings.[4]

---

[4] *Accord Joseph S. v. Hogan*, 561 F. Supp.2d 280, 290-91 (E.D.N.Y. 2008) ("[T]he language from *Olmstead* concerning determinations by 'the State's treatment professionals [ ]' appears to be based on the particular facts of that case and not central to the Court's holding. … I reject defendants' argument that Olmstead requires that the state's mental health professionals be the ones to determine that an individual's needs may be met in a more integrated setting.") (finding that plaintiffs may prevail if the complaint plausibly alleges that "a determination has been made that a particular individual's needs may be met in a more integrated setting"); *Disability Advocates, Inc. v. Paterson*, 653 F. Supp.2d 184, 258-59 (E.D.N.Y. 2009), *rev'd on other grounds sub nom. Disability Advocates, Inc. v. N.Y. Coalition for Quality Assisted Living, Inc.*, 675 F.3d 149 (2d Cir. 2012) (The court concludes that the law does not require DAI to [show that each of its constituents has been deemed eligible for supported housing by a treatment provider] in order to prove that its constituents are qualified. … The court does not read *Olmstead* as creating a requirement that a plaintiff alleging discrimination under the ADA must present evidence that he or she has been assessed by a 'treatment provider' and found eligible to be

Department of Justice Statement on Integration Mandate, question 4.

54.    The *Olmstead* decision has become firmly embedded in national policy.  In 2001, President Bush issued Executive Order 13125, affirming that "[t]he United States is committed to community-based alternatives for individuals with disabilities and recognizes that such services advance the best interests of Americans" and "foster independence and participation in the community for Americans with disabilities."  The Executive Order directed key federal agencies to fully implement the *Olmstead* decision and "ensure that community-based services for people with disabilities are available."  The same year, President Bush launched a New Freedom Initiative to promote community living for people with disabilities.  The President's New Freedom Commission on Mental Health declared, "Not since the Americans with Disabilities Act (ADA) … and the Supreme Court's *Olmstead v. L.C.* decision, which affirmed the right to live in community settings, has there been cause for such promise and opportunity for full community participation for all people with disabilities, including those with psychiatric disabilities."[5]  In 2009, on the tenth anniversary of the *Olmstead* decision, President Obama launched the "Year of Community Living."[6]  The Justice Department's dedicated *Olmstead* webpage highlights its enforcement efforts across the country.  U.S. Department of Justice, Civil Rights Division, Olmstead: Community Integration for Everyone, https://www.ada.gov/olmstead/olmstead_ enforcement.htm.

**B.    The Rehabilitation Act and California's Non-Discrimination Statute**

55.    Section 504 of the Rehabilitation Act bans discrimination by recipients of federal funds,

---

served in a more integrated setting. …  DAI has presented persuasive evidence from a variety of sources, including the Defendants' Assessment Project, that its constituents are qualified to receive services in the community.") *Long v. Benson*, No. 4:08-cv-00026-RH-WCS, 2008 WL 4571904, at *2 (N.D. Fla. Oct. 14, 2008) ("[A public entity] cannot deny the right [to be served in the community] simply by refusing to acknowledge that the individual could receive appropriate care in the community.  Otherwise the right would, or at least could, become wholly illusory.").

[5] President's New Freedom Commission on Mental Health, Achieving the Promise: Transforming Mental Health Care in America, Executive Summary, https://govinfo.library.unt.edu/ mentalhealthcommission/reports/FinalReport/FullReport-1.htm.

[6] The White House, President Obama Commemorates Anniversary of Olmstead and Announces New Initiatives to Assist Americans with Disabilities (June 22, 2009), https://obamawhitehouse. archives.gov/the-press-office/president-obama-commemorates-anniversary-olmstead-and-announces-new-initiatives-ass.

1   such as Defendants herein.  29 U.S.C. §§ 794-794(a).  It contains the same "integration mandate" and

2   similar prohibitions against discrimination as Title II of the ADA.

3          56.     Likewise, California's non-discrimination statute prohibits discriminatory actions by the

4   state and state-funded agencies or departments, and provides civil enforcement rights for violations.

5   Section 11135 states, in pertinent part:

> With respect to discrimination on the basis of disability, programs and
> activities subject to subdivision (a) shall meet the protections and
> prohibitions contained in Section 202 of the Americans with Disabilities
> Act of 1990 (42 U.S.C. § 12132), and the federal rules and regulations
> adopted in implementation thereof, except that if the laws of this state
> prescribe stronger protections and prohibitions, the programs and
> activities subject to subdivision (a) shall be subject to stronger
> protections and prohibitions.

11  Cal. Gov't Code § 11135(b).

## VI.   FACTUAL ALLEGATIONS

13         57.     Alameda County is a large, diverse county located in Northern California.  It is home to

14  a population of approximately 1.67 million residents and contains fourteen incorporated cities

15  (including Oakland, Berkeley, Fremont, Union City, Hayward, Alameda, Newark, Pleasanton and

16  Dublin) and several unincorporated areas.  Alameda County's population is approximately 32% Asian,

17  30% White, 22% Latinx, and 11% Black.

18         58.     Defendants' mental health care system is required by federal and state law to provide

19  treatment and services to County residents with serious mental health disabilities, including DRC

20  Constituents.

21         59.     ACBHCS is the agency primarily responsible for implementing Alameda County's

22  system for serving people with serious mental health disabilities, including executing the County's

23  Medi-Cal Mental Health Plan and overseeing its Mental Health Services Act ("MHSA") planning and

24  spending.  ACBHCS contracts with organizations and businesses to provide services.  ACBHCS

25  contracts with Alameda Health System for institutional care at John George and with Telecare

26  Corporation for institutional care at Villa Fairmont.

27

28

797662.2

60.     State law requires that Alameda County's mental health system include the services that DRC Constituents require, while in the community, to avoid unnecessary institutionalization.[7]  A primary goal of California's County-based "systems of care" is to provide services to adults with serious mental health disabilities who use inpatient care, are homeless, and/or are involved in the criminal system.  Cal. Welf. & Inst. Code § 5600.3(b).

**A.      The County's Provision of Mental Health Services**

61.     The County's mental health service system includes the following:  rehabilitative mental health services including medication support services, intensive case management, psychiatric crisis services, substance use disorder treatment, and residential services.  These services can be provided in institutional settings like John George or Villa Fairmont, or in community settings.

a.      **Rehabilitative mental health services** include assessment and plan development, medication support services, therapies, interventions, and education designed to restore, maintain or increase independence and self-sufficiency, including employment.  When these services are provided by or with the help of peers, who have lived experience in the mental health system, they are often referred to as "peer support services."[8]

b.      **Intensive case management** helps individuals gain access to needed medical, social, educational, and other services including through face-to-face encounters with provider staff; supports the assessment and periodic reassessment of individual needs and the development of an individualized service plan; and includes monitoring of whether the plan is being properly implemented and is successful, and, if not successful, facilitating revisions to the plan.

---

[7] The provision of services in the community is authorized and funded (using federal, state and local monies) under a number of California programs, including: the Bronzan-McCorquodale Act, Cal. Welf. & Inst. Code §§ 5600, *et seq.*; Medi-Cal Specialty Mental Health Services, Cal. Welf. & Inst. Code §§ 14700, *et seq.*; 9 Cal. Code Regs. §§ 1810.100, 1810.247; Mental Health Services Act, Proposition 63 (2003); and California's Medi-Cal program, Cal. Welf. & Inst. Code §§ 14000 *et seq.*, 22 Cal. Code Regs. §§ 50000 *et seq.*

[8] Peer supports can help people with serious mental health disabilities stay connected to treatment providers, develop or maintain social relationships, and participate in community activities.  They help individuals transition to the community from institutional or correctional settings.

c.    **Crisis services** include crisis stabilization, mobile crisis services, and community-based residential crisis services, such as crisis homes or apartments.  Crisis services are provided by teams of mental health professionals who respond quickly to individuals in crisis and utilize a variety of techniques to de-escalate the situation and resolve the crisis.

d.    **Substance use disorder treatment** includes individual and group services including medication assisted therapy ("MAT"), outpatient and residential treatment, counseling and therapy, and peer support services.

62.    **Residential services** include providing a safe and supportive place to live while receiving mental health services.  These services are cost effective and successfully integrate people into their communities when they are provided in the form of supported housing.  Supported housing typically has two components: (1) a rental subsidy for the individual with a mental health disability, and (2) services to support the individual's successful tenancy, including rehabilitative mental health services that promote independent living skills.

63.    When these services are provided in community settings, they may be provided through programs such as **Full Service Partnerships ("FSPs")**.  FSPs are funded through the County's Medi-Cal and MHSA programs.  FSPs are vehicles for providing in the community rehabilitative mental health services, intensive case management services, crisis services, and substance abuse disorder treatment to individuals with serious mental health disabilities who are frequent users of hospital or emergency room services, are criminal system involved, and/or are homeless.  9 Cal. Code Regs. § 3620.05.  Housing is also part of the "full spectrum of services" that FSPs were designed to provide, including "rental subsidies, housing vouchers … and transitional and temporary housing."  9 Cal. Code Regs. § 3620(a)(1)(B)(iii).  All or virtually all DRC Constituents are eligible to receive services in the community through the County's FSP program.

64.    Typically, FSPs provide services using an "ACT" model, which emphasizes outreach to and engagement of people with serious mental health disabilities.  "ACT" refers to "Assertive Community Treatment."  In the ACT model, teams of professionals and peers provide individuals with mental health services they need for as long as they need them.  Services are provided at home, at work, and in other settings, with the goal of helping individuals live stably in the community.  In

16

797662.2

1    recognition that the ACT model delivers *in the community* a range of services available in institutional

2    settings, it has often been referred to as a "hospital without walls."

3        65.    DRC Constituents do not oppose—and in fact would strongly prefer—to receive the

4    above-described services in the community.

5        66.    Upon information and belief, the community placements sought by DRC Constituents

6    are appropriate and mental health professionals, including mental health professionals employed by

7    Defendants or their contractors, have determined that DRC Constituents are eligible for the above-

8    described community service.

9        67.    Defendants know how to provide the above-described mental health services in the

10   community, and Defendants have a framework for providing these services in the community.

11   However, Defendants have failed to provide DRC Constituents with these services as needed to

12   prevent their institutionalization.

13       68.    Defendants' failure to provide DRC Constituents with these services in the community

14   places DRC Constituents at serious risk of institutionalization at John George and/or Villa Fairmont

15   and perpetuates a cycle of repeated institutionalization.

16   **B.    Institutionalization at John George and Villa Fairmont**

17       69.    When a DRC Constituent is experiencing a mental health crisis, California's civil

18   commitment laws allow the DRC Constituent to be detained in a psychiatric institution.[9]

19       70.    More individuals are detained in Alameda County than any other county in

20   California.  Its psychiatric detention rate is three-and-a-half times higher than the statewide average.

21       71.    Throughout Defendants' service system, decisions of treating professionals are made

22   against the backdrop of, and are constrained by, the services actually available for treatment and where

23   they are located.

24       72.    John George provides 24-hour emergency psychiatric care, seven days a week.  It is the

25

26   [9] Cal. Welf. Inst. Code § 5150(a).  Cal. Welf. Inst. Code § 5120 authorizes Counties to delignate the
     facilities in which individuals will be detained.  John George is a designated facility.  John George is
27   part of the County's mental health care system.  The County contracts with the Alameda Health
     System (AHS), which operates John George.  The County provides funding for John George.
28

797662.2

only facility in the County that does so. It has a locked Psychiatric Emergency Services unit ("PES") and three locked inpatient units.  It is large, crowded, and physically isolated from community life.

73.     Defendants detain 30% more people at the John George than a decade ago, although the population of the County has grown by less than 10% during that period.

74.     A disproportionate number of the individuals detained at John George —36%—are Black.  This is more than three times their overall representation in Alameda County.

75.     At John George's Psychiatric Emergency Services unit, DRC Constituents may receive rehabilitative mental health services including medication support services, intensive case management, crisis services, and residential services.

76.     In the process of receiving or waiting to receive these services, DRC Constituents are crowded into a locked 35-foot-by-45-foot room, illuminated by harsh fluorescent lights.  The room can be filled with upwards of sixty (60) people with mental health disabilities.  Sometimes they overflow into hallways.  These conditions can exacerbate people's mental health symptoms.

77.     Most DRC Constituents admitted to the PES unit are discharged to the community.

78.     As the County has acknowledged, the majority of people discharged from the PES unit "are not linked to planned services and continue to over-use emergency services."[10]

79.     Approximately 25% of those admitted to the PES are transferred to John George's locked inpatient units.  In John George's inpatient units, patients receive rehabilitative mental health services including medication support services, intensive case management, crisis services, substance use disorder treatment, and residential services.

80.     In the process of receiving these services, DRC Constituents are confined in locked wards, monitored continuously, afforded little privacy or autonomy, and required to abide by rigid rules.

81.     In recent years, the average daily census and length of stay in the John George's

---

[10] *See* Alameda County: Community Assessment and Transport Team (CATT) Innovation Plan -
October 25, 2018, available at http://mhsoac.ca.gov/document/inn-plan-alameda-county-community-
assessment-and-transport-team-catt-october-25-2018.
https://www.eastbayexpress.com/oakland/overwhelmed/Content?mode=print&oid=4705660.

797662.2

1    inpatient units have risen.

2        82.    Some DRC Constituents in John George's PES or inpatient units are discharged to Villa

3    Fairmont, a 96-bed, locked "sub-acute" mental health facility located on the same campus as John

4    George.  Villa Fairmont is an institution where residents have little privacy or autonomy.  At Villa

5    Fairmont, patients receive rehabilitative mental health services including medication support services,

6    intensive case management, services for psychiatric crises, substance use disorder treatment, and

7    residential services.

8    **C.    <u>Failure to Provide Community Services Puts DRC Constituents at Serious Risk of</u>

9        <u>Unnecessary Institutionalization.</u>**

10        83.    Denied needed services in the community, DRC Constituents "cycle" in and out of John

11    George and Villa Fairmont.  Such cycling in and out of institutionalizations is "the hallmark of a failed

12    system" that violates disability civil rights laws.  *United States v. Mississippi*, 400 F. Supp. 3d 546, 555

13    (S.D. Miss. 2019).

14        84.    A highly disproportionate number of DRC Constituents who cycle in and out of the

15    County's psychiatric institutions are Black.  From January 2018 to June 2020, more than 45% of

16    individuals institutionalized in County psychiatric facilities three or more times were Black.

17        85.    During that period, 55% of the more than 350 individuals institutionalized at the PES

18    over ten (10) times were Black, close to 60% of the more than eighty (80) individuals admitted twenty-

19    five (25) times or more to PES were Black, five of the six individuals institutionalized at the PES more

20    than eighty-five (85) times were Black, and approximately 44% of the more than 360 individuals

21    institutionalized at John George's inpatient units four (4) or more times were Black.

22        86.    The high rate of re-institutionalization is the direct result of Defendants' failure to

23    provide DRC Constituents the services they need while in the community.

24        87.    The services provided through Defendants' Full Service Partnership programs fail to

25    reach DRC Constituents who need them, leading to their returning again and again to institutional

26    settings to receive services.

27        88.    Defendants have some community-based crisis services, designed to be alternatives to

28    institutionalization at John George.  But these crisis services have inadequate capacity, hours of

1  operation, and geographic accessibility, meaning that they do not reach DRC Constituents who need

2  such services to avoid unnecessary institutionalizations.

3  89.     In order to avoid re-institutionalization, many DRC Constituents need residential

4  services in the community.  The two Plaintiffs in *Olmstead*, for example, when discharged by

5  Defendants from the state hospital, were provided not only the non-residential services they had

6  formerly received in the hospital, but also supported housing.  *See Olmstead*, 527 U.S. at 594 ("L.C.'s

7  pleading requested, among other things, that the State place her in a community care residential

8  program."); *L.C. v. Olmstead*, No. 1:95-cv-01210 (N.D. Ga.), Doc. No. 128 (June 22, 2000) (Joint

9  Motion for Incorporation of Settlement Agreement Into Order Upon Remand), at 5 ("Community

10  Services and Placements To Be Provided …  It is hereby agreed by the undersigned Defendant(s) that

11  the Plaintiffs will be maintained in their current community-based residential placements or other

12  setting appropriate to their needs …"), https://www.clearinghouse.net/chDocs/public/PB-GA-0001-

13  0012.pdf.

14  90.     The California legislature has found that those receiving supported housing "reduced

15  their visits to an emergency department by 56 percent, and their hospital admissions by 45 percent."

16  Cal. Welf. & Inst. Code § 5849.1(b)(9).  The provision of supported housing through FSP programs in

17  Alameda County has "demonstrated reductions in inpatient … per client costs by an average of more

18  than $50,000/year."[11]

19  91.     Yet, according to ACBHCS and service providers, the lack of residential services,

20  including permanent supported housing, is "a major challenge" for DRC Constituents, and leads to

21  further re-institutionalization.

22  92.     Because the County lacks residential services, DRC Constituents are frequently

23  discharged from John George and Villa Fairmont to homelessness.  Some DRC Constituents end up in

24  emergency shelters, when shelter beds are available.  Others end up in homeless encampments

25

26  [11] Alameda County Health Care Services Agency, Subject: Adopt the Fiscal Year 2018-19 Mental
Health Services Act Annual Plan Update for Alameda County Behavioral Health (June 4, 2019), at 9,

27  http://www.acgov.org/board/bos_calendar/documents/DocsAgendaReg_06_18_19/HEALTH%20CAR

28  E%20SERVICES/Regular%20Calendar/Homelessness%20Council%20-%20HCSA_281214.pdf.

crammed under overpasses.[12]  This housing instability contributes directly to their being re-institutionalized at John George.

93.    Mr. Walter's experiences illustrate the link between homelessness and re-institutionalization.  From 2015 to 2017, when Mr. Walter was homeless, Mr. Walter was institutionalized at John George on forty-three (43) occasions, including seven (7) times in one month.  During this past year, Mr. Walter lost his housing and was institutionalized again.

94.    Defendants are aware of their failure to serve Black DRC Constituents in particular.  Speaking for ACBHCS, former director Marye L. Thomas, M.D., noted that in Alameda County, as with many other parts of California, its behavioral health program generally serves African Americans in "extremely restrictive (often involuntary) settings such as hospitals and jails."  This "leads [Defendant ACBHCS] to conclude that many African Americans are being inappropriately served."[13]

95.    If DRC Constituents received the mental health services they needed in the community, they could avoid future unnecessary psychiatric institutionalizations.

D.    **The County's Provision of Mental Health Services in Institutions Rather than Community Settings Harms DRC Constituents.**

96.    Defendants' failure to provide needed community-based services has devastating effects.  DRC Constituents do not receive the services they need to stabilize their conditions in the community, and they live at constant and high risk of unnecessary institutionalization.

97.    Defendants' practice of requiring DRC Constituents to be admitted to the County's psychiatric institutions to receive needed services hinders DRC Constituents' ability to gain control over their symptoms, undermines their participation in community life, and perpetuates the stereotype that they are incapable of living stably in the community and leading a full life.

98.    The lack of community services puts DRC Constituents, particularly Black DRC

---

[12] Thomas Fuller & Josh Haner, *Among the World's Most Dire Places: This California Homeless Camp*, N.Y. Times (Dec. 17, 2019), https://www.nytimes.com/interactive/2019/12/17/us/oakland-california-homeless-camp.html;
[13] African American Utilization Report at 8, 24 (Winter 2011), http://archive.mhsoac.ca.gov/Meetings/docs/Meetings/2014/August/CLCC_082014_AI3_AAUReport.pdf

797662.2

Constituents, at high risk of being arrested and incarcerated in the County's jail.  Approximately one-quarter of the people held in the County's jail population have been identified as having a "serious mental illness."[14]  Typically, DRC Constituents are jailed for minor offenses that are disability-related.

99.    Once detained, DRC Constituents have longer stays on average than other jail inmates and are at greater risk of committing acts of self-harm and being punished for minor infractions.  A large number of people with mental illness have died in the County's jail.[15]

100.    Defendants' actions have also increased DRC Constituents' risk of contracting COVID-19.  Congregate settings can be incubators for COVID-19, which has spread through John George and Villa Fairmont, as well as the jail and County homeless shelters.  Those institutionalized at John George's PES sit in close proximity to one another for several hours.  In John George's inpatient units and at Villa Fairmont, rooms have multiple beds and sealed windows, hallways are narrow, staff move between wards, and alcohol-based hand sanitizer is not readily available.  Many DRC Constituents have health conditions that increase the risk of death if they contract COVID-19.

101.    Residents without disabilities are encouraged by the County to shelter in place.  But DRC Constituents must enter congregate settings to obtain needed services.

102.    Recent data indicates that the COVID-19 death rate among Black people is substantially higher than that of other groups, and that rates of depression and anxiety have spiked among Black people since the pandemic began.  These factors compound the racial disparities already present in the County's mental health system.

**E.    The County Can Provide Community Services Without Fundamentally Altering Its System.**

103.    The community placement of DRC Constituents, including provision of the services

---

[14] A "serious mental illness" is another term for "serious mental health disability" and is generally defined as "a mental, behavioral, or emotional disorder resulting in serious functional impairment, which substantially interferes with or limits one or more major life activities."  Nat'l Inst. of Mental Health, Mental Health Information, https://www.nimh.nih.gov/health/statistics/mental-illness.shtml.
[15] *See, e.g.*, Lisa Fernandez, A look at the 45 inmates who have died at Santa Rita Jail in the last five years, KTVU (Oct. 4, 2019), https://www.ktvu.com/news/a-look-at-the-45-inmates-who-have-died-at-santa-rita-jail-in-the-last-five-years.

797662.2

sought herein, can be reasonably accommodated.  This can be accomplished with reasonable modifications to Defendants' service system.

104.    Defendants can implement the relief DRC seeks without fundamentally altering their service system.  Defendants could reasonably modify their service system to avoid the needless re-institutionalization of DRC Constituents by, *inter alia*, expanding provider capacity to deliver mental health services in the community, relocating services from institutions to the community, and maximizing available funding including through Medi-Cal.

105.    Publicly available records show that the average cost per visit to John George's PES is $3,010.  The average cost per day for John George's inpatient units is $2,602, and the average daily cost at Villa Fairmont is close to $400 per day.  The average length of stay at John George for DRC Constituents who are homeless is eight days, amounting to more than $20,000 in cost per person.  At Villa Fairmont, the average stay is four (4) months, costing $48,000 per person.

106.    According to County data, in 2019 the County spent 30% of its entire mental health budget on about 800 individuals with the highest utilization of public mental health services in the County.  Fully 70% of those dollars were spent on institutional care at John George and Villa Fairmont and mental health services in jail.  The County could prevent DRC Constituents' needless re-institutionalization if the dollars the County spent on avoidable institutional care were spent instead to provide them needed mental health services in the community including supported housing.

107.    The relief DRC seeks is both legally required and financially feasible.

## VII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of Title II of the ADA**
**Unnecessary Institutionalization and**
**Failure to Provide Services in the Most Integrated Setting Appropriate**
**42 U.S.C. §§ 12131 *et seq.*, 28 C.F.R. § 35.130**

108.    Plaintiff repeats and incorporates by reference the preceding paragraphs of this Complaint as if set forth in full herein.

109.    DRC Constituents are qualified individuals with disabilities within the meaning of Title II of the ADA and meet the essential eligibility requirements for the receipt of services, programs, or

1    activities of Defendants.  42 U.S.C. § 12131(2).

2        110.    Defendant Alameda County, which includes Alameda County Behavioral Health Care

3    Services, is a public entity subject to Title II, 42 U.S.C. § 12131(1).

4        111.    Defendants violate the ADA, and its implementing regulations, including as follows:

5        a.    By administering the County's mental health system in a way that subjects DRC

6    Constituents to unnecessary institutionalization at a psychiatric hospital or other institution instead of

7    providing them with services in the community, and places them at serious risk of such

8    institutionalization.  42 U.S.C. § 12132.

9        b.    By failing to administer services, programs, and activities in "the most integrated

10   setting" appropriate to the needs of DRC Constituents.  28 C.F.R. § 35.130(d).

11       c.    By directly or through contractual or other arrangements utilizing criteria or methods of

12   administration in Alameda County's mental health system that subject DRC Constituents to

13   discrimination on the basis of their disabilities.  28 C.F.R. § 35.130(b)(3).

14       d.    By failing to make reasonable modifications to allow DRC Constituents to participate in

15   Defendants' services, programs, and activities in an integrated community setting.

16       112.    Providing DRC Constituents with the community services they need to avoid

17   unnecessary institutionalization and segregation at a psychiatric hospital or other institution would not

18   fundamentally alter Defendants' programs, services, or activities.

19       113.    Plaintiff and DRC Constituents have suffered and will suffer injury as a proximate

20   result of Defendants' violation of their rights under the ADA.

21       114.    Plaintiff is entitled to declaratory relief, injunctive relief, attorneys' fees, and costs.

22   **VIII.   SECOND CLAIM FOR RELIEF**
     **Violation of Section 504 of the Rehabilitation Act**

23   **Unnecessary Institutionalization and**
     **Failure to Provide Services in the Most Integrated Setting Appropriate**

24   **29 U.S.C. § 794; 28 C.F.R. § 41.51; 45 C.F.R. § 84.4**

25

26       115.    Plaintiff repeats and incorporates by reference the preceding paragraphs of this

27   Complaint as if set forth in full herein.

28       116.    DRC Constituents are qualified individuals with disabilities within the meaning of

24

1    Section 504 of the Rehabilitation Act.  29 U.S.C.§ 794(a).

2        117.    Defendants are engaged in providing programs or activities receiving Federal financial

3    assistance sufficient to invoke the coverage of Section 504.  *Id.* § 794(b)(1) & (b)(3).

4        118.    Defendants violate Section 504, and its implementing regulations, including as follows:

5        a.    By failing to administer services, programs, and activities in "the most integrated

6    setting" appropriate to the needs of the DRC Constituents.  28 C.F.R. § 41.51(d); 45 C.F.R.

7    § 84.4(b)(2).

8        b.    By directly or through contractual or other arrangements utilizing criteria or methods of

9    administration in Alameda County's mental health system that subject DRC Constituents to

10   discrimination on the basis of their disabilities.  28 C.F.R. § 41.51(b)(3); 45 C.F.R. § 84.4(b)(4)

11       119.    Providing DRC Constituents with the community services they need to avoid

12   unnecessary institutionalization and segregation at a psychiatric hospital or other institution would not

13   fundamentally alter Defendants' programs, services, or activities.

14       120.    Plaintiff and DRC Constituents have suffered and will suffer injury as a proximate

15   result of Defendants' violation of their rights under Section 504 of the Rehabilitation Act.

16       121.    Plaintiff is entitled to declaratory relief, injunctive relief, attorneys' fees, and costs.

### IX.    THIRD CLAIM FOR RELIEF
#### Violation of California Government Code §§ 11135 and 11139

19       122.    Plaintiff repeats and incorporates by reference the preceding paragraphs of this

20   Complaint as if set forth in full herein.

21       123.    California Government Code sections 11135 and 11139 prohibit discrimination against

22   persons on the basis of physical or mental disability and other protected statuses in state-run or state-

23   funded programs and activities.

24       124.    Defendants Alameda County and ACBHCS are recipients of financial assistance from

25   the state of California under Government Code section 11135(a).

26       125.    California Government Code § 11135(b) incorporates the protections and prohibitions

27   contained in the ADA and its implementing regulations.  Section 11135(b) states in pertinent part, that:

28       With respect to discrimination on the basis of disability, programs and
         activities   subject   to   subdivision   (a)   shall   meet   the   protections   and

25

prohibitions contained in Section 202 of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12132), and the federal rules and regulations adopted in implementation thereof, except that if the laws of this state prescribe stronger protections and prohibitions, the programs and activities subject to subdivision (a) shall be subject to stronger protections and prohibitions.

126.     Accordingly, Defendants' failure to provide DRC Constituents with services in the most integrated setting appropriate as alleged above, which violates the ADA, also violates Section 11135.

127.     In addition, Defendants' policies and methods of administering Alameda County's mental health system—directly or through contractual or other arrangements—subjects DRC Constituents to unnecessary institutionalization and segregation at psychiatric hospitals and other institutions, instead of providing them with services in the community.  2 Cal. Code Regs. § 11154(e).

128.     For all the reasons outlined above, Defendants have violated and continue to violate California Government Code § 11135 and 11139 through their non-compliance with the statute and its implementing regulations, *see* 2 Cal. Code Regs. § 11154(i).

129.     Plaintiff is entitled to declaratory relief, injunctive relief, attorneys' fees, and costs.

## X.     REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

130.     Issue a declaratory judgment that Defendants are violating the ADA, Section 504 of the Rehabilitation Act, and California Government Code section 11135 by, *inter alia*:

a.     failing to provide DRC Constituents with services in the most integrated setting and needlessly institutionalizing them in a psychiatric hospital or other institution or putting them at serious risk of such institutionalization;

b.     discriminating against DRC Constituents on the basis of disability by utilizing methods of administration that result in unnecessary institutionalization or subjecting them to a serious risk of such institutionalization;

131.     Enjoin Defendants, their successors in office, subordinates, agents, employees and assigns, and all persons acting in concert from subjecting DRC Constituents to the unlawful acts and omissions described herein, and issue an injunction sufficient to remedy these violations;

132.     Order Defendants to take immediate action to reform their policies, procedures, and

practices to fully comply with the ADA, Section 504, and state law.  Under such order, Defendants must:

a.      Operate a mental health system that does not result in the unnecessary institutionalization of DRC Constituents, or place DRC Constituents at serious risk of institutionalization;

b.      Provide these mental health services in the community in a quantity and manner that prevents unnecessary institutionalization of DRC Constituents: rehabilitative mental health services, including medication support services; intensive case management; services for psychiatric crises; substance use disorder treatment; and residential services.

133.    Retain jurisdiction of this case until Defendants have fully complied with the orders of this Court and there is reasonable assurance that Defendants will continue to comply in the future absent the Court's continuing jurisdiction;

134.    Award Plaintiff reasonable attorneys' fees, costs, expenses, and disbursements as authorized by law; and

135.    Grant further relief as the Court may deem just and proper.


Dated: February 22, 2021                    Respectfully submitted,

                                            DISABILITY RIGHTS CALIFORNIA

                                            */s/ Kimberly Swain*
                                            Kimberly Swain

                                            GOLDSTEIN, BORGEN, DARDARIAN & HO

                                            */s/ Andrew P. Lee*
                                            Andrew P. Lee

                                            BAZELON CENTER FOR MENTAL HEALTH LAW

                                            */s/ Ira A. Burnim*
                                            Ira A. Burnim

797662.2

1

DISABILITY RIGHTS EDUCATION AND DEFENSE
FUND

2

3

*/s/ Claudia Center*
Claudia Center

4

LAW OFFICE OF AARON J. FISCHER

5

6

*/s/ Aaron J. Fischer*
Aaron J. Fischer

7

*Attorneys for Plaintiff*

8

9

**SIGNATURE ATTESTATION**

10

In accordance with Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this

11

document has been obtained from the signatories on this e-filed document.

12

Dated:  February 22, 2021

*/s/ Andrew P. Lee*
Andrew P. Lee

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

797662.2